# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
Indiana Department of Child Services
Lafayette, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| T.B., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 79A04-1110-JT-594 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
Cause No. 79D03-1106-JT-73 and 79D03-1106-JT-75

**June 29, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

T.B. ("Mother") appeals the involuntary termination of her parental rights to her children and asks this court to adopt a policy that prohibits the involuntary termination of parental rights for all mentally retarded parents. We affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of N.B., born in April 2005, and M.B., born in August 2008.[1] The facts most favorable to the trial court's judgment reveal that in June 2010 the local Tippecanoe County Office of the Indiana Department of Child Services ("TCDCS") received a report that Mother had left N.B. and M.B. at home in the care of a mentally handicapped thirteen-year-old sitter for several hours. During its assessment, the TCDCS case manager observed the family home to be in a state of disarray, the children appeared dirty, N.B. and M.B. had not eaten since early that morning, and M.B. had a broken foot that was wrapped in dirty bandages. Five-year-old N.B. also informed the case worker that Mother had left him home alone on several prior occasions. In addition, it was discovered that Mother had failed to follow the Emergency Room doctor's discharge orders directing her to obtain follow-up medical care for M.B.'s foot. Based on this assessment, TCDCS took both children into emergency protective custody.

The following day, TCDCS filed petitions alleging N.B. and M.B. were children in need of services ("CHINS"). Mother admitted to the allegations of the CHINS petitions, and the children were so adjudicated. In July 2010, the trial court issued a

---

[1] N.B.'s biological father is B.O. M.B.'s biological father is unknown. The parental rights of both fathers were involuntarily terminated by the trial court in its August 2011 judgment. Neither father participates in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

dispositional order directing Mother to successfully complete a variety of tasks and services designed to improve her parenting abilities and to facilitate reunification of the family. Among other things, Mother was ordered to: (1) submit to both a mental health evaluation and a medication assessment; (2) engage in intensive home-based case management services; (3) participate in individual therapy; (4) complete parenting education classes; (5) visit regularly with the children; (6) obtain safe and stable housing; and (7) maintain a stable, legal source of income sufficient to support the family.

Although Mother began participating in several reunification services following the children's initial removal, her participation throughout the CHINS case was sporadic and ultimately unsuccessful. For example, in August 2010 Mother submitted to both a biopsychological assessment with Dr. Martin Abbert and a psychological evaluation with Dr. Jeff Vandewater-Percy in September 2010. The results of Dr. Vandewater-Percy's evaluation indicated that Mother has poor reasoning skills, poor memory and/or attention skills, and her overall cognitive functioning is in the "low" to "well below average" range of functioning. Exhibits, Vol. II, Petitioner's Ex. 6.[2] Dr. Vandewater-Percy also reported that Mother "presents as a chronically depressed young mother with a highly ambivalent style of relating to others that probably originates from her reported history of rejection and abuse." Id. Dr. Vandewater-Percy further observed that although Mother is "very reliant on others for support, guidance, and affirmation," she nevertheless is "exceedingly mistrustful" and "suspicious" of others and thus her "relationships are likely to be unstable with fluctuating degrees of emotional investment." Id. Dr. Abbert's report to

---

[2] Unfortunately, the pages of the volumes of Exhibits submitted on appeal are not enumerated. We therefore are unable to provide a specific page number when citing to the exhibits throughout this opinion.

the court confirmed that Mother has "Borderline Intellect[ual]" functioning and suffers with "Cyclothymia"[3] with "cycling several times a day." Id., Petitioner's Ex. 10. Dr. Abbert therefore recommended that Mother continue to take her prescribed antidepressant medication, Lexapro, and wrote additional prescriptions for Vyvanse and Lamictal.[4]

Despite her ongoing struggles with depression and other significant mental health issues, Mother refused to take her medications as prescribed. Therapists and other service providers also consistently reported that Mother was not committed to the therapeutic process and cancelled and/or failed to show for more than half of both her individual therapy sessions and home-based counseling appointments. Although the children were returned to Mother's care for a trial home visit in December 2010, after she obtained independent housing, Mother continued to be non-compliant with many court-ordered services and actually began to regress in services. For example, Mother was not utilizing age-appropriate discipline methods, refused to follow recommended parenting techniques, allowed unapproved persons with past criminal records to provide childcare for the children, and became involved in a new romantic relationship with an individual whom she allowed to move into the family home only days after meeting the individual and without obtaining TCDCS's prior approval.

---

[3] Cyclothymia, also known as cyclothymic disorder, is a mild form of bipolar disorder in which a person has mood swings over a period of years that range from mild depression to euphoria and excitement.

[4] Vyvanse is a prescription medication used to treat the symptoms of attention deficit hyperactivity disorder. Lamictal is a prescription medication that is approved for use in the treatment of epilepsy and bipolar disorder.

Following an emergency modification hearing in April 2011, the children were again removed from Mother's care. This removal was due in large part to the numerous safety concerns that remained in the home, as well as Mother's continuing inability to adequately provide for the children's basic needs. After the children's second removal, TCDCS continued to offer reunification services to Mother, including intensive home-based case management services, individual therapy, and supervised visitation with the children. Mother nevertheless was unable to sustain any progress in her overall ability to properly care for herself and for her children. Specifically, Mother continued to miss approximately seventy-five percent of her scheduled individual therapy sessions and fifty percent of her home-based counseling appointments, failed to maintain stable housing and employment, refused to take her prescription medication, and was repeatedly dishonest with service providers. Mother also visited the Emergency Room several times per week for routine medical issues, complained of being chronically tired, and refused to follow physicians' recommendations. As for scheduled visits with the children, Mother remained incapable of maintaining appropriate discipline during visits, discussed inappropriate adult issues in front of the children, and oftentimes ended visits early.

TCDCS eventually filed petitions seeking the involuntary termination of Mother's parental rights to both children in June 2011. An evidentiary hearing was later held in August 2011. During the termination hearing, TCDCS presented substantial evidence concerning Mother's failure to successfully complete a majority of the trial court's dispositional goals, including (1) successfully participating in individual counseling to address her chronic depression and other mental health issues; (2) taking her own

5

medications as prescribed; (3) achieving stable and independent housing and employment; (4) learning and incorporating age-appropriate discipline techniques; and (5) demonstrating she is capable of establishing a safe, sanitary, and stable home environment for herself and the children. In so doing, TCDCS introduced evidence establishing Mother failed to maintain steady employment during the underlying proceedings, lost her HUD status in July 2011, and was forced to move out of her apartment the week before the termination hearing. Consequently, Mother was living with and financially dependent upon her most recent boyfriend.

TCDCS also presented evidence that Mother had recently been arrested, twice, for driving without a valid driver's license. She received a thirty-day suspended sentence in July 2011, and was facing an additional charge of Driving While Suspended at the time of the termination hearing. In addition, Mother's own testimony during the termination hearing that genetic testing confirmed she has "alien genes" further demonstrated Mother's ongoing distorted thinking. Transcript at 113.

As for the children, TCDCS presented substantial evidence establishing that when N.B. was removed from Mother's care he presented as "very weepy," "very whiny," "very agitated," and "very shut down." Transcript p. 58. The evidence further established that N.B.'s emotional well-being and performance in school "improved enormously" following his removal from Mother's care and placement in a supportive and structured foster home. In addition, the nightmares N.B. experienced "every single night" while in Mother's care stopped happening once N.B. was placed in foster care. Id. at 64. Testimony from the children's therapist also revealed that neither N.B. nor M.B.

was bonded with Mother. Finally, both the TCDCS case manager and court-appointed special advocate ("CASA") recommended termination of Mother's parental rights as in the children's best interests, and the children's therapist informed the trial court that both children needed to be protected from the harm and chronic neglect that they suffered while in Mother's care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On September 28, 2011, the trial court entered its judgment terminating Mother's parental rights to N.B. and M.B. Mother now appeals.

## DISCUSSION AND DECISION

Initially, we note our standard of review. Here, in terminating Mother's parental rights, the trial court entered numerous detailed findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

Before an involuntary termination of parental rights can occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

7

> (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2010).[5]   The State's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).  Moreover, under Indiana Code Section 31-35-2-8(a), if the court does not find that the allegations in a petition are true, then the court shall dismiss the petition.

Here, the trial court made numerous thoughtful findings regarding Mother's ongoing inability and/or unwillingness to meet her parental responsibilities notwithstanding TCDCS's provision of "exhaustive home based services" designed to "thoroughly address[]" Mother's mental health and intellectual functioning throughout the entirety of the underlying CHINS and termination proceedings.  Appellant's App. at 37-8, 40.  Despite the wealth of services provided to Mother for more than one year, the trial court determined that, at the time of the termination hearing, Mother remained

---

[5]  We observe that Indiana Code Section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

incapable of providing the children with a safe and stable home environment. Specifically, the court found as follows:

28. Mother continues to struggle in almost all aspects of her life. Mother does not appear to be able to take care of herself. The children have suffered from chronic neglect in Mother's care. Even after sixteen (16) months of services[,] Mother does not have the capacity to take care of the children on a daily basis.

29. [The] Court finds that services and treatment were provided to Mother in a concrete manner consistent with her mental health and intellectual challenges. While Mother will continue to have mental health and intellectual challenges, her failure to comply with treatment, distorted thinking, and ongoing deception with providers continues to serve as a barrier to successful reunification with her children. The Court finds that the children would most likely face future harm in Mother's care.

* * *

32. The Court finds, as a matter of law, that after more than sixteen (16) months of rendering services of various kinds with different providers to this family that there is not any basis for any reasonable belief that the circumstances which resulted in the removal of the children from [Mother's] care or the reasons for continued placement outside the home will be remedied. Mother has demonstrated a continuing pattern of noncompliance with her services, and an over-riding failure to place her children as a priority. Mother does not indicate that she has a basic understanding or belief of the harm her children have suffered given her choices and instabilities in her own life. Mother, therefore, is unable to provide a minimally safe, secure, and stable home for these children.

* * *

35. The Court further finds that [TCDCS] has an acceptable, reasonable, appropriate and satisfactory plan for the care and treatment of the children. The children can be adopted. The plan is that they be adopted together.

36. The Court finds it would be in the best interests of the child for the rights of the natural Mother, [T.B.] and natural children, [N.B.] and

9

[M.B.], [to] be terminated so that the children can be placed for adoption at the earliest possible time.

Appellant's App. at 40-41.

Mother does not challenge the evidence supporting any of the trial court's specific findings cited above. In fact, Mother confirms in her Appellant's Brief that TCDCS provided "massive services" to Mother during the underlying proceedings. Appellant's Brief at 19. Rather, Mother's sole argument on appeal is that "mentally retarded parents should be immune from losing their parental rights." Appellant's Brief at 18.

In making this argument, Mother compares involuntary termination proceedings to criminal proceedings. She then asks this court to "assum[e] arguendo" that the result of a termination proceeding is actually a "penalty" to the parent, rather than a decision made in the best interests of the child, and thereafter posits that such a penalty violates the prohibition against cruel and unusual punishment found in Article 1, Section 15 of the United States Constitution because the ultimate result is to make the child "legally dead" to the parent. Id. at 19. Mother then states that such a result is not proportional to the nature of the offense when dealing with mentally disabled parents and asks this court to "examine the practice" of terminating the parental rights of a parent who is mentally retarded "and adopt a prohibition against such practice." Id. at 21.

It is not a proper function of this court to ignore the clear language of a statute and, in effect, rewrite the statute in order to render it consistent with a particular view of sound public policy. See, e.g., Robinson v. Monroe Cnty., 663 N.E.2d 196 (Ind. Ct. App. 1996) (concluding that court could not ignore unambiguous language of statute's exemption of particular class of individuals from abiding by certain safety requirement regardless of

10

court's view as to the wisdom of the exemption). Moreover, contrary to what Mother would have this court "assume arguendo," the Indiana Supreme Court has made clear that the "purpose of terminating parental rights is not to punish parents, but to protect the children." Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1234 (Ind. 1992) (citing Lassiter v. Dept. of Social Services, 452 U.S. 18, 101 S. Ct. 2153, 68 L.Ed.2d. 640 (1984)). Our Supreme Court has further explained that "[a]lthough parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents." Egly, 592 N.E.2d at 1234. This includes situations not only where the child is in immediate danger of losing his life, "but also where the child's emotional and physical development are threatened." Id. In addition, it is well-settled that "mental retardation, standing alone, is not a proper ground for termination of parental rights." Id. It therefore stands to reason that the converse should also be true. That is to say that mental retardation, standing alone, is not a proper ground for automatically *prohibiting* the termination of parental rights.

For all these reasons, we decline Mother's invitation to depart from the clear and unambiguous language of Indiana's termination statute in order to judicially legislate an exception whereby mentally handicapped parents are immune from involuntary termination proceedings. Moreover, because the trial court's unchallenged findings clearly and convincingly support its ultimate decision to terminate Mother's parental rights to N.B. and M.B., we find no error. See McBride, 798 N.E.2d 185, 198-199 (Ind. 2003) (stating that a judgment is clearly erroneous only when it is unsupported by the

11

findings and conclusions entered on those findings); <u>see</u> <u>also</u> <u>In re E.S.</u>, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002) (concluding that when evidence shows emotional and physical development of child in need of services is threatened, termination of parent-child relationship is appropriate).

Affirmed.

RILEY, J., and DARDEN, J., concur.