**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

**Jul 31 2013, 6:28 am**

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
Department of Child Services,
Tippecanoe County Office
Lafayette, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF M.N., MINOR CHILD, AND HIS FATHER, M.D.N., | ) ) ) ) ) |
| M.D.N., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 79A02-1301-JT-21 ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Faith A. Graham, Judge
Cause No. 79D03-1209-JT-94

**July 31, 2013**

**BRADFORD, Judge**

Appellant-Respondent M.D.N. ("Father") appeals the juvenile court's order terminating his parental rights to his son, M.N. In challenging the termination of his parental rights, Father does not challenge the sufficiency of the juvenile court's findings of fact or the juvenile court's conclusions thereon. Instead, Father invites this court to adopt a policy that would prohibit the involuntary termination of parental rights of all parents suffering from mental retardation. Upon review, we decline Father's invitation and accept this court's conclusion in *T.B. v. Indiana Department of Child Services*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*, that mental retardation, standing alone, is not a proper ground for automatically prohibiting the termination of parental rights. Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

M.N. was born to Father and A.N. ("Mother") on November 9, 2011.[1] At the time of M.N.'s birth, Father was involved with DCS because DCS had received reports that Father had another child that was in need of services.[2] Mother was not the mother of this other child.

With respect to M.N., DCS became involved with the family after receiving a report on December 28, 2011, that M.N. was a victim of neglect "in the maltreatment type of

---

[1] The termination of Mother's parental rights is not at issue in this appeal. As such, we will include facts pertaining to Mother only to the extent that they are relevant to the termination of Father's parental rights.

[2] At some point, Father's parental rights to this child were also terminated.

environment life/health endangering." DCS Ex. 1, p. 1. The report also indicated that Mother and Father did not have an adequate supply of formula for M.N. and did not have a plan for obtaining more. The report further indicated that the family's home was very dirty and messy; that Mother and Father repeatedly failed to properly secure M.N. in his car seat; that there was no place in the home for M.N. to engage in "tummy time" as instructed by M.N.'s doctor; that Father is quick to anger, has threatened "several" people, and his anger prevents him from effectively communicating with providers that can assist him in meeting M.N.'s needs; that Mother told the investigator to "stop questioning her" about dirty bottles that were strewn around the home; and that Father became upset when the investigator would not tell him who called DCS on the family, telling the investigator to "get the f*** out of my house." DCS Ex. 1, pp.1-2. The report also noted that Mother and Father rely on others to provide for M.N.'s basic needs and become angry and make threats when assistance is not given. In addition, Father failed to consistently show up for scheduled appointments with his therapist or doctor.

On January 18, 2012, DCS filed a verified petition alleging that M.N. was a child in need of services ("CHINS"). On or about February 24, 2012, following a fact-finding hearing, the juvenile court found M.N. to be a CHINS. The juvenile court issued a dispositional order and parental participation decree on March 19, 2012, in which it ordered Father to complete certain services. Father, however, did not complete all of these services. At one point, the juvenile court found Father in contempt because he failed to participate in visitation pursuant to the treatment team agreement, attend all mental health treatment

3

appointments, and participate in family and individual home based case management services and follow all recommendations.

On September 24, 2012, DCS filed a petition seeking the termination of Father's parental rights to N.M. On November 9, 2012, the juvenile court conducted an evidentiary termination hearing at which Father appeared and was represented by counsel. During the termination hearing, DCS introduced evidence relating to Father's failure to seek consistent treatment for his mental health issues, Father's inability or refusal to properly care for N.M., and Father's failure to participate in or benefit from the services offered by DCS. DCS also introduced evidence indicating that termination of Father's parental rights was in N.M.'s best interests, and that its plan for the permanent care and treatment of N.M. was adoption. Following the conclusion of the termination hearing, the juvenile court terminated Father's parental rights to N.M. Father now appeals.

**DISCUSSION AND DECISION**

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

4

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

5

(A) one (1) of the following exists:

      (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

      (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

      (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

      (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

      (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

      (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011).

Here, the juvenile court made numerous thoughtful findings regarding Father's ongoing inability and/or unwillingness to meet his parental responsibilities notwithstanding the multitude of services that were designed to address Father's mental health and intellectual functioning throughout the underlying CHINS and instant termination proceedings. Despite the wealth of services provided to Father, the juvenile court determined that, at the time of the termination hearing, Father remained incapable of providing M.N. with a safe and stable home environment. Specifically, the juvenile court found as follows:

> 2. Father was involved in a prior CHINS proceeding … under Cause No.

6

79D03-1108-JC-169. The prior CHINS proceedings resulted in an involuntary termination of Father's parental rights. For ease of reading, the prior CHINS proceedings will hereinafter be referred to as the "first CHINS case". For further ease of reading, the underlying CHINS proceeding (Cause No. 79D03-1201-JC-2) regarding [M.N.] resulting in this termination hearing will hereinafter be referred to as the "second CHINS case".

3.      The reasons for the first CHINS case involved that mother's illegal drug use, untreated mental health issues and struggles with stability. Father also struggled with stability. Father was diagnosed with mild mental retardation and a personality disorder for which he received disability benefits. Father's mental health issues manifested themselves by poor impulse control, angry outbursts, and a general inability to independently meet his own needs without assistance. Father was not treatment or medication compliant. Father displayed little interest in parenting and maintained only minimal contact with [the child].

4.      [M.N.] was born during the first CHINS case. Tippecanoe County Child Protective Services ("CPS") received a report on or about December 28, 2011 alleging that Mother had exhausted all resources and did not have sufficient formula for the infant. It was further alleged that Mother did not understand proper feeding which resulted in insufficient nutrition and that Mother's ability to care for the infant was concerning.

5.      Further investigation revealed the reasons for the second CHINS case included the same concerns regarding Father noted above. The parents resided together in a "dirty and messy" home with "clothes everywhere (clean and dirty), empty frozen food trays, 12 dirty baby bottles, trash, and cans and jars of goods lying on the living room floor". Spoiled formula and food was noted in the refrigerator. The conditions of the home and nutritional concerns did not improve with preliminary in-home services and a safety plan. The parents displayed a lack of knowledge regarding parenting skills or developmental milestones and demonstrated an inability or unwillingness to cooperate with recommended and necessary services. Both displayed angry outbursts with service providers and each other.

**\*\*\*\***

9.      Father was offered services during the first CHINS case. Pursuant to the dispositional order and parental participation decree issued in the second CHINS case, … Father was offered parenting classes, psychiatric evaluation, mental health treatment, family and individual home-based case management, medication management, individual therapy, anger management group, substance abuse assessment, and supervised visitation. These services have been exhaustive and have been designed to address the difficulties that have come to light since the initial removal of the child. Services provided to both parents were adjusted to accommodate cognitive functioning, social anxiety,

7

limited coping skills, and lack of motivation.

10. A permanency hearing was held on September 24, 2012 at which time the permanent plan was determined to be the initiation of proceedings for termination of parental rights and adoption. Neither parent had shown a real investment in reunification. DCS filed its petitions in the above-referenced Cause No. on September 24, 2012. The evidentiary hearing on the Verified Petitions to Terminate Parental Rights was held on November 9, 2012. At the time of the termination hearing, the circumstances of the parents had not improved. The parents were in no better position to care for the child.

**\*\*\*\***

13. Father also has a long-standing history of general instability. Father resided in several foster homes, group homes, and in residential placement during his youth. Father has a history of institutional placements as an adult including jail, prison, and inpatient mental health facilities. Father has a history of abuse as well as angry, manipulative and impulsive behavior including suicide threats. Father's historical diagnoses include ODD, ADHD, Depression, Mood Disorder NOS, Bipolar Disorder NOS, Generalized Anxiety Disorder, Marijuana Abuse/Cannabis Dependence, Alcohol Abuse/Dependence, Probable Personality Disorder, and Mild Mental Retardation (MMR). Father has displayed a consistent pattern of noncompliance with mental health treatment and medications. Father displays functional impairments in activities of daily living as well as interpersonal and psychological functioning.

14. Father is currently twenty-six (26) years of age. Father participated in special education services before dropping out of school in the eleventh grade and is functionally illiterate. Father's employment history is sporadic at best and he receives disability income and food stamps also monitored by a designated payee. Father was convicted of theft in 2007.

15. The parents married on July 10, 2011. The relationship is filled with turmoil and both parents have displayed significant anger with the other at various times. The parents have demonstrated a pattern of separation following by reunification throughout the CHINS proceeding. The parents are unable to remain focused on the child rather than their volatile relationship.

16. Neither parent has been able to maintain stable or appropriate housing. In February 2012, Mother resided in a one (1) bedroom apartment with Father along with two (2) friends and their two (2) children. The conditions of the home were very poor. Service providers consistently observed dirty dishes and trash throughout the home. Broken glass and a razor blade were found on the floor and, on most occasions, only a small walkway allowed access to the living area. The conditions of the home never improved. The parents also lived with Father's cousin for a short time. During various periods of separation, the parents lived with other friends or relatives. At the time of the

termination hearing, the parents were residing together at the Knights Inn hotel with financial assistance from a non-relative.

17. The parents failed to regularly attend services without reasonable explanation. Both parents were unsuccessfully discharged from multiple services.… Father continued his historical pattern of failing to remain medication and treatment compliant. Neither parent made a distinct improvement toward attaining a single goal in services. Both parents refused to accept redirection and failed to take advantage of services.

18. Father displayed threatening behavior at times and is clearly unable to safely provide care for a child.…

19. Both parents failed to regularly attend scheduled visitations.… Father attended only four (4) of ten (10) scheduled visits in August 2012. Father failed to attend any scheduled visits in September 2012 and was also unsuccessfully discharged by the service provider.

20. The parents were not receptive to redirection during supervised visitations. Outbursts by the parents were disruptive and at times threatening resulting in special guidelines banning weapons. The parents never demonstrated an ability to grasp the child's ongoing developmental needs despite extensive intervention. Visit facilitators occasionally ceased the visit in order to protect the child's safety and well-being. The parents are unable to care for the child safely without direct supervision and are unable to meet the child's developmental needs.

21. Although Mother and Father love this child, neither has the ability to meet the child's needs. It is not safe for the child to be in the care of Mother or Father at this time. The long-standing history of instability displayed by these parents continues today. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationships would be detrimental to the child. The child needs stability and permanency now.

22. Despite some core parenting skills displayed by Mother, all other concerns remain. Both parents continue to lack the ability to manage basic needs on a daily basis without assistance. The parents cannot safely parent a child without the assistance of community based services. The parents have actively resisted those services. The parents struggle with understanding developmental and medication needs. The parents pose a continued danger to the child's long-term health due to inadvertent harm or neglect.

23. [Court-Appointed Special Advocate ("CASA")], Denise Newton, supports termination of parental rights in the best interests of the child. CASA noted that the volatile relationship between the parents has impeded reunification efforts for both parents. CASA has observed no evidence the parents are able or willing to maintain a suitable home environment for the child. Neither parent has demonstrated commitment to services necessary to

achieve safety and permanency for the child. There is a lack of bonding between the child and the parents and each parent voiced a desire to voluntarily terminate parental rights at various times.

Appellant's App. pp. 61-64.

Father does not challenge the evidence supporting any of the trial court's specific findings cited above. Rather, Father's "sole argument on appeal is that mentally retarded parents should be immune from losing their parental rights." Appellant's Br. p. 13. In making this argument, Father acknowledges that in *T.B.*, this court has rejected this argument and concluded that mental retardation, standing alone, is not a proper ground for automatically prohibiting the termination of parental rights. 971 N.E.2d at 110. Father asks, however, that we reconsider this court's conclusion in *T.B.*

In *T.B.*, the appellant raised the exact argument raised by Father in the instant matter. 971 N.E.2d at 109.

> In making this argument, [appellant] compare[d] involuntary termination proceedings to criminal proceedings. She then ask[ed] this court to "assume arguendo" that the result of a termination proceeding is actually a "penalty" to the parent, rather than a decision made in the best interests of the child, and thereafter posits that such a penalty violates the prohibition against cruel and unusual punishment found in Article 1, Section 15 of the United States Constitution because the ultimate result is to make the child "legally dead" to the parent. [Appellant's Br. p. 19.] [Appellant] then state[d] that such a result is not proportional to the nature of the offense when dealing with mentally disabled parents and ask[ed] this court to "examine the practice" of terminating the parental rights of a parent who is mentally retarded "and adopt a prohibition against such practice." *Id*. at 21.

*Id*. at 109-10. Upon review, this court concluded as follows:

> It is not a proper function of this court to ignore the clear language of a statute and, in effect, rewrite the statute in order to render it consistent with a particular view of sound public policy. *See, e.g.*, *Robinson v. Monroe Cnty.*,

10

663 N.E.2d 196 (Ind. Ct. App. 1996) (concluding that court could not ignore unambiguous language of statute's exemption of particular class of individuals from abiding by certain safety requirement regardless of court's view as to the wisdom of the exemption). Moreover, contrary to what [appellant] would have this court "assume arguendo," the Indiana Supreme Court has made clear that the "purpose of terminating parental rights is not to punish parents, but to protect the children." *Egly v. Blackford Cnty. Dep't of Public Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992) (citing *Lassiter v. Dept. of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Our Supreme Court has further explained that "[a]lthough parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents." *Egly*, 592 N.E.2d at 1234. This includes situations not only where the child is in immediate danger of losing his life, "but also where the child's emotional and physical development are threatened." *Id*. In addition, it is well-settled that "mental retardation, standing alone, is not a proper ground for termination of parental rights." *Id*. It therefore stands to reason that the converse should also be true. That is to say that mental retardation, standing alone, is not a proper ground for automatically *prohibiting* the termination of parental rights.

*Id*. at 110 (emphasis in original).

For all these reasons, this court declined the appellant's invitation to depart from the clear and unambiguous language of Indiana's termination statute in order to judicially legislate an exception whereby mentally handicapped parents are immune from involuntary termination proceedings. *Id*. Moreover, "because the trial court's unchallenged findings clearly and convincingly support its ultimate decision to terminate [appellant's] parental rights to [the children]," this court found no error. *Id*. (citing *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 198-199 (Ind. App. 2003) (stating that a judgment is clearly erroneous only when it is unsupported by the findings and conclusions entered on those findings); *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002) (concluding that when evidence shows emotional and physical development of child in need

11

of services is threatened, termination of parent-child relationship is appropriate)).

Upon review, we find the reasoning set forth in *T.B.* to be convincing. As such, we decline Father's request that we conclude otherwise. Like the court in *T.B.*, we conclude that while mental retardation alone is not a proper ground for terminating one's parental rights, the converse is true that mental retardation, standing alone, is not a proper ground for automatically prohibiting the termination of parental rights. *See id.* Accordingly, we also decline to depart from "the clear and unambiguous language of Indiana's termination statute in order to judicially legislate an exception whereby mentally handicapped parents are immune from involuntary termination proceedings." *Id.*

Again, Father does not challenge the sufficiency of the evidence supporting the juvenile court's findings or the court's conclusions thereon on appeal. As such, the unchallenged findings stand as proven. *See generally City of Whiting v. City of East Chicago*, 266 Ind. 12, 19, 359 N.E.2d 536, 540 (1977) (providing that a party waives a challenge to the sufficiency of the evidence supporting the trial courts findings when the party does not provide any argument relating to the sufficiency of the findings of the trial court on appeal); *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. Ap. 2000) (providing that "where a party challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment"). Here the unchallenged findings of the juvenile court support its conclusions thereon and prove the elements of Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence.

12

Accordingly, because the juvenile court's unchallenged findings clearly and convincingly support its conclusions thereon as well as the ultimate decision to terminate Father's parental rights to M.N., we find no error.

The judgment of the juvenile court is affirmed.

KIRSCH, J., and MAY, J., concur.