# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 08 2019, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Roberta Renbarger
Renbarger Law Firm
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of J.S. and M.S. (Minor Children), | January 8, 2019 |
| Children in Need of Services, | Court of Appeals Case No. 18A-JC-1791 |
| and | Appeal from the Wells Superior Court |
| P.W. (Mother) and J.W. (Stepfather), | The Honorable Kenton W. Kiracofe, Judge |
| *Appellants-Respondents,* | Trial Court Cause Nos. 90C01-1802-JC-2, -3 |
| v. | |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner* | |

**Crone, Judge.**

## Case Summary

[1] P.W. ("Mother") and J.W. ("Stepfather") (collectively "Appellants") appeal a trial court order adjudicating Mother's sons, J.S. and M.S. (collectively "the Children"), as children in need of services ("CHINS"). They challenge the sufficiency of the evidence to support the CHINS determination and raise a due process argument concerning J.S.'s placement. We affirm.

## Facts and Procedural History

[2] Following her divorce from P.S. ("Father"),[1] Mother was awarded physical custody of J.S. (born in 2004) and M.S. (born in 2008). In 2017, the Children were living with Mother and Stepfather. Early that year, Appellants discovered that J.S. had been viewing online pornography. In November 2017, M.S. disclosed to Appellants that J.S. had been molesting him for a few months. When Stepfather confronted J.S. with M.S.'s allegations, he became physical with J.S., knocking him off his feet. Appellants immediately contacted Father, who took J.S. to his house temporarily. Meanwhile, Appellants decided that the Children would not be left together except under supervision and that they would install alarms on their bedroom doors. In the middle of January, Father

---

[1] Father is not participating in this appeal.

called Weber and Associates to schedule initial intake appointments for counseling for the Children. Tr. Vol. 2 at 23.

[3] On January 20, 2018, the Indiana Department of Child Services ("DCS") received a report that J.S. had molested M.S. over a three-month period and that Mother had failed to seek services for the Children. That same day, DCS Family Case Manager ("FCM") Lindsey Feinberg visited Appellants' home to conduct an assessment. The Children were not home, and Appellants indicated that they were both at Father's house. When FCM Feinberg attempted to discuss the allegations with Appellants, Stepfather told her that they would neither speak to her nor allow her to interview the Children until they had consulted their attorney. When she walked through the home, she saw no signs of any alarms on the Children's bedroom doors. Before she left, she completed a safety plan specifying that Appellants must maintain contact with her, keep the Children separated, and obtain counseling services for each child. The next day, Stepfather contacted FCM Feinberg and told her about the pornographic website that J.S. had been visiting. FCM Feinberg told Stepfather that per DCS protocol, both boys needed to undergo a forensic interview.

[4] On January 22, 2018, FCM Feinberg contacted Mother, who told her that she had set up counseling appointments for the Children at Weber and Associates. Later that day, Stepfather told FCM Feinberg that the Children would be going for counseling appointments at Phoenix and Associates ("Phoenix"). FCM Feinberg reminded Stepfather about the Children's need for forensic interviews, and Stepfather told her that Appellants' attorney ("Counsel") would be

handling the scheduling of forensic interviews. FCM Feinberg also attempted to contact Father but was unsuccessful.

[5] Meanwhile, Counsel contacted FCM Feinberg and indicated preferences concerning the times, location, and personnel involved in conducting the forensic interviews. Counsel also requested that there be no police presence at the interviews, which DCS declined, and demanded that the interviews be conducted after regular school hours. FCM Feinberg arranged the interviews at the requested location, scheduled them for January 24, 2018, and notified Appellants and Counsel. Stepfather indicated that he did not want the forensic interviews to take place until the Children were in counseling. Counsel said that the interviews were scheduled on too short of notice and wanted them to be conducted at her law office instead. DCS denied the request but rescheduled the interviews for February 1, 2018, at Appellants' previously requested location. The Children did not attend the forensic interviews as scheduled, and DCS filed a motion to compel conduct.

[6] On February 5, 2018, the trial court issued orders to comply with the DCS investigation. DCS rescheduled the forensic interviews for February 7, 2018. Mother brought M.S. for his interview as scheduled, but J.S. did not attend his interview. During M.S.'s interview, he disclosed that J.S. had repeatedly forced him to perform oral sex on him, to the point that M.S.'s mouth hurt. He also reported that J.S. performed anal intercourse on him and showed him a pornographic video. M.S. indicated that J.S. had threatened him and ordered him not to disclose the molestation. The assaults took place over a two- to

three-month period inside the Children's house or inside a barn on their property. M.S. also revealed that Stepfather had punched J.S. to the floor and kicked him when he confronted J.S. about the sexual assault. He also revealed that on previous occasions when Stepfather had spanked him, he left red marks and it hurt to sit down.

[7] The day after M.S.'s forensic interview, DCS filed a petition to remove and detain the Children. Meanwhile, FCM Feinberg made further attempts to contact Father. The trial court granted DCS's petition and signed an emergency protective custody order for both boys, who were then taken from their schools. J.S. was placed at Pierceton Woods in an inpatient treatment program designed to prevent relapse by juvenile sex offenders. M.S. was placed in foster care. That same day, Father returned FCM Feinberg's call and reported that he had not returned her previous phone calls because Appellants had told him to have no contact with DCS. When asked, he told FCM Feinberg that he had a brother and a sister who might serve as relative placements.

[8] On February 9, 2018, DCS filed CHINS petitions as to J.S. and M.S. A few days later, M.S. was removed from foster care and was placed with Father. He participated in counseling at Phoenix, home-based services with Father, and supervised visitation with Mother. In March 2018, DCS petitioned to change J.S.'s placement to an inpatient program at Redwood due to a couple missed medication incidents at Pierceton Woods. The court granted the petition without a hearing, but after an investigation into the reasons for the missed

medication doses, J.S. was allowed to remain at Pierceton Woods, where his caseworkers report that he is doing well and is advancing more rapidly than most other juveniles in the program.

[9] After a multi-day factfinding hearing, on June 27, 2018, the trial court issued an order with findings of fact and conclusions thereon adjudicating J.S. and M.S. as CHINS. Following a July 9, 2018 dispositional hearing, Mother was ordered to complete a parenting assessment and psychological evaluation and to attend all scheduled visitations with the Children. Stepfather failed to attend the July hearing and had his dispositional hearing in August. The dispositional decree as to Stepfather is not included in the record. Appellants now appeal. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – The evidence is sufficient to support the CHINS determination.

[10] Appellants challenge the sufficiency of the evidence to support the CHINS determination. When reviewing the sufficiency of evidence, we give due regard to the trial court's ability to assess the credibility of witnesses. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949

N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id.* Appellate courts generally grant latitude and deference to trial courts in family law matters. *Matter of E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied* (2018). This deference recognizes the trial court's "unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id.*

[11] In a CHINS proceeding, DCS bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). To meet its burden of establishing CHINS status, DCS must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

[12] Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s). *N.E.*, 919 N.E.2d at 105. In other words, despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that – a determination that a child is in need of services." *Id*. (citations omitted).

[13] Appellants do not dispute that the Children need care, treatment, or rehabilitation. Rather, they maintain that the trial court erred in ultimately determining that they are unable or have refused or neglected to supply the Children with necessary supervision or treatment in the aftermath absent the court's coercive intervention. Because they do not specifically challenge any of the court's findings, we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*.

[14] In challenging the trial court's determination that the Children were unlikely to receive necessary treatment absent its coercive intervention, Appellants claim that by the time DCS became involved, they had already taken every step necessary to help the Children except for the actual counseling appointments. They point to safety measures such as bedroom door alarms, as well as the separation and supervision of the Children. However, FCM Feinberg testified that she looked and did not notice any door alarms when she toured Appellants' home two months after M.S.'s disclosures. Tr. Vol. 2 at 89. As for

the Children's separation, FCM Feinberg testified that at the time of her visit, Appellants told her that the boys were both at Father's for a couple days. *Id*. at 90. Mother also cites her ill health as a reason for waiting nearly two months to arrange counseling for the Children. The record shows that she indeed suffered health issues and a brief hospitalization between the time of M.S.'s disclosures and DCS's involvement. Nevertheless, other than Father's mid-January call to arrange intake appointments at Weber and Associates, it appears that neither Father nor Stepfather took any initiative to ensure that the Children received treatment/counseling while Mother was indisposed.

[15]     The uncontested findings also reflect that Appellants repeatedly failed to cooperate with DCS. From FCM Feinberg's first visit to their home to the time of the factfinding hearing, Appellants were not forthcoming with DCS. Stepfather essentially told FCM Feinberg that they would neither talk to her nor allow the Children to do so until they secured legal counsel. Appellants also instructed Father not to talk to FCM Feinberg and told him that their attorney was handling matters. FCM Feinberg accommodated Appellants' various specifications as to the location, time, and certain personnel to be involved in the Children's forensic interviews. Yet, appointments were repeatedly rescheduled due to Appellants' failure to present the Children for those interviews. *See* Appealed Order at 5 (finding 42 describing DCS's "extraordinary efforts" to speak to Children, Mother, and Counsel, and finding that "Mother, along with her attorney, thwarted those efforts by not appearing at the scheduled interviews on several occasions."). DCS eventually sought and

obtained an order to compel cooperation, and even then, Appellants' compliance was only partial; they brought M.S., but not J.S., to be interviewed. As of the date of the factfinding hearing, J.S. had yet to sit for a forensic interview. This amounts to a demonstrated unwillingness by Appellants to provide necessary treatment for the Children even *with* the court's coercive intervention.

[16] As for Mother's assertion that she could not keep the Children apart and present them both for their interviews, the record shows Father and Stepfather both to be licensed drivers who could have pitched in to ensure that each boy separately arrived at his interview as scheduled. Stepfather testified that he ordinarily does not drive the Children but would be available to drive them in emergency situations. Tr. Vol. 2 at 28-29. It is difficult to see how this would not have qualified as one of those situations.

[17] With respect to J.S.'s treatment at Pierceton Woods, caseworker Bethany Figolah testified that though J.S. has advanced rapidly through the levels of treatment, he can advance no further without submitting to a polygraph, which he is willing to do but for which Appellants have not granted permission. *Id.* at 40-41. In addressing the reasons for placing M.S. with Father after a brief stay in foster care, the court relied on M.S.'s assertions that Stepfather had physically abused J.S. on the night of the disclosures and had left red marks after past spankings of M.S. Appellants claim that M.S.'s descriptions are exaggerated and lack corroboration, but as the trial court accurately observed, it was Appellants who facilitated the vacuum by repeatedly refusing to present

J.S. for a forensic interview. Appellants' argument concerning exaggerated descriptions is an invitation to reweigh evidence and reassess witness credibility, which we cannot do.

[18] Simply put, the uncontested findings support the trial court's ultimate determination that it is in the Children's best interests to be removed from the home environment, that remaining in the home would be contrary to their welfare due to Appellants' inability to provide care and/or supervision without coercive intervention, and that the Children each need "protection that cannot be provided in the home." Appealed Order at 6-7. As such, we affirm the CHINS determination.

## Section 2 – Appellants were not denied due process concerning J.S.'s placement.

[19] Appellants allege that they were denied due process based on DCS's alleged failure to consider placing J.S. with relatives and its decision to place him at a facility that is fifty miles from their home. Because every CHINS proceeding has the potential to interfere with parents' rights to raise their children, due process protections are vital at every stage of the proceedings. *In re L.C.*, 23 N.E.3d 37, 40 (Ind. Ct. App. 2015), *trans. denied*. For this reason, we balance "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *In re G.P.*, 4 N.E.3d 1158, 1165-66 (Ind. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Ultimately, due process requires "the opportunity to be heard at a meaningful

time and in a meaningful manner." *K.D.*, 962 N.E.2d at 1257 (quoting *Mathews*, 424 U.S. at 333).

[20] Indiana Code Section 31-34-4-2(a) requires that in CHINS proceedings, before DCS places the child in an out-of-home placement, it must consider a relative placement. Subsection (b) defines a relative placement as "a relative related by blood, marriage, or adoption." Here, the trial court removed the Children from Appellants' care immediately after M.S.'s forensic interview. M.S.'s disclosures concerning sexual and physical abuse occurring in Appellants' home underscored the gravity of the circumstances. The court emphasized this in its conclusions, stating "that reasonable efforts to prevent or eliminate removal of the Children were not required due to the emergency nature of the situation[.]" Appellants' App. Vol. 2 at 23.

[21] Appellants' argument appears twofold: that DCS should have placed J.S. in a facility closer to their home, and that DCS failed to consider relative placement. FCM Feinberg stated that her primary concern was getting J.S. the help he needed. Tr. Vol. 2 at 100. With this goal in mind, J.S. was placed in a facility with a program specifically geared for juvenile sex offenders, albeit fifty miles from Appellants' home. Though similar facilities may exist that are closer to Appellants' home, the statute makes no requirement as to inpatient treatment in proximity to a particular parent. While we appreciate Appellants' interest in having J.S. placed in a convenient location, we believe that in these dire circumstances, the State's countervailing interest in protecting the Children

supports J.S.'s placement in the specialized treatment program offered at Pierceton Woods.

[22] With respect to DCS's alleged failure to consider a relative placement, Appellants admit in their brief that FCM Feinberg "talked to [Father] about whether he had relatives in the area [and that Father] disclosed that he had a sister and brother in the area." Appellants' Br. at 21 (citing Tr. Vol. 2 at 100). Their complaint in this regard appears to center on FCM Feinberg's testimony that she discussed the matter only with Father and did not speak to them about possible placement with either of their relatives. The statute does not require DCS to conduct an exhaustive search for suitable relatives; rather, it simply requires that DCS *consider* relative placement, which it did. Appellants were not denied due process due to J.S.'s placement. Accordingly, we affirm.

[23] Affirmed.

Vaidik, C.J., and Mathias, J., concur.