## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 14 2017, 8:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marianne Woolbert
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of I.K. and L.K. (Minor Children),<br><br>and K.F.<br><br>(Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | March 14, 2017<br><br>Court of Appeals Case No. 48A02-1607-JT-1628<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable G. George Pancol, Judge<br><br>Trial Court Cause Nos. 48C02-1511-JT-67 48C02-1511-JT-68 |

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent K.F. ("Mother") appeals the juvenile court's order terminating her parental rights to I.K. and L.K. (collectively, "the Children"). She raises the following restated issue on appeal: whether the Appellee-Petitioner the Indiana Department of Child Services ("DCS") presented sufficient evidence to support termination of her parental rights to the Children. Specifically, Mother contends that DCS did not prove by clear and convincing evidence that (1) the conditions that resulted in the Children's removal could not be remedied within a reasonable amount of time, (2) continuation of the parent-child relationship posed a threat to the well-being of the Children, and (3) termination was in the Children's best interests. Concluding that the evidence is sufficient to support the termination order, we affirm.

# Facts and Procedural History

[2] Mother is the biological parent of I.K., who was born on December 25, 2008, and L.K., who was born on June 19, 2012.[1] On November 4, 2013, DCS filed petitions alleging the Children to be children in need of services ("CHINS") due to a physical altercation between Mother and the Children's father (collectively

---

[1] The biological father's rights were also terminated, but he does not participate in this appeal.

"the Parents").[2] DCS removed the Children from the home and care of the Parents and placed the Children with the parental grandmother. On January 8, 2014, the juvenile court held a dispositional hearing and issued its dispositional decree ordering Mother to participate in various services, including supervised visitation, individual counseling, and homebased case work and therapy. On April 20, 2014, the juvenile court modified the dispositional decree and authorized the placement of the Children in foster care.

During the November 12, 2014, permanency hearing, the juvenile court learned that Mother had not been compliant with the case plan and had tested positive for THC on September 23, 2014. At the November 20, 2014 permanency hearing, the juvenile court changed the Children's permanency plan to termination of parental rights with a concurrent plan of adoption.

On April 5 and 26, 2016, the juvenile court held a fact-finding hearing on DCS' termination petitions. At the hearing, DCS' family case manager ("FCM") Samantha Allbee and Court Appointed Special Advocate ("CASA") Jessica Barker testified that termination of parental rights was in the best interests of the Children. Based upon all of the evidence presented, the juvenile court entered an order terminating Mother's parental rights to the Children on June 7, 2016. In doing so, the juvenile court made the following pertinent specific findings:[3]

---

[2] DCS has an extensive history with the family.

[3] While this order applies to I.K., the trial court issues a nearly identical order relative to L.K.

3.) On 11/1/13, the child's mother and father engaged in an episode of domestic violence against each other which resulted in the father going to the hospital from the encounter and also being arrested for charges of domestic battery against the mother. The child's parents have a significant history of domestic violence against each other, with multiple arrests for battery charges and invasion of privacy charges on either parent in which they have alternated the roles of assailant and victim. These incidents have taken place throughout the child's life and placed the child's safety and well-being at risk, as well as contributing to a lengthy and uninterrupted instability as the hallmark of the child's life.

4.) The child's father and mother have also engaged in substance abuse, further jeopardizing the child's well-being and contributing to the previously noted instability. The mother also has multiple mental health diagnoses that have gone untreated, or for which the mother has failed to obtain or maintain adequate treatment, counseling, and medication, further causing instability and chaos in the child's life.

5.) A Child In Need of Services ("CHINS") Petition was filed under cause number 48C02-1311-JC-287 in November of 2013, due to the domestic violence prevalent between the child's parents, and the child was detained along with the child's sibling.[4]

6.) On 11/20/13, the child's parents admitted the allegations of the CHINS petition and the status of the child as a CHINS and the matter was set for a disposition and parental participation petition hearing. The child and sibling remained removed from the home and care of the parents.

---

[4] CHINS petition filed under cause number 48C02-1311-JC-288.

7.) At the disposition and parental participation petition hearing conducted on 1/8/14, the parents were ordered to participate in reunification efforts, including obeying the law, participating in individual counseling, abstaining from the use or possession of illegal drugs, maintaining routine contact with DCS, keeping all appointments with DCS or engaged service providers, notifying DCS of any changes in contact information, participating in home-based therapy, obtaining and maintaining housing and source of support or income sufficient for the safe and appropriate upbringing of the child, and participating in visitation with the child and sibling as established by the Department.

8.) The child's mother has been an infrequent full-time caregiver for the child or child's sibling, both during and preceding the initiation of the CHINS proceedings, and has never provided essential and necessary stability for the child as a result. The child became the ward of a guardianship held by the child's paternal grandmother at the age of one-year-old, which remained in place at the time the CHINS proceedings were initiated. Custody for the child's sibling was granted to the child's father in October of 2013, when the child was approximately 16 months old. Neither child has returned to either parent['s] care or control since the original removal in November of 2015.

9.) The child's mother has held multiple short term residences both during and preceding the initiation of CHINS proceedings, and has not been able to maintain her own stable home for any appreciable amount of time, nor provide the same for either child in these same time periods.

The child's mother has lived in approximately thirteen different residences during this child's lifetime (beginning in 2009), and at least seven different residences since the CHINS proceedings were initiated.

10.) The mother has been evicted on multiple occasions by landlords, as reflected in multiple small claims case chronologies demonstrating the same which were admitted as exhibits by DCS in the termination trial proceedings, and including in 2013 and 2014. Mother testified that she lost her most recent house in May of 2015 due to being unable to maintain payments for the housing. On the last day of trial, mother represented to the Court that she had acquired a new apartment and had been living there for approximately 2½ months in the Castleton area of Indianapolis. However, upon cross examination of a subsequent witness put forth by the mother, her father's current wife, it was revealed that it is actually that person, and not the mother, who is providing the funding for mother's current housing, meaning that on the last date of the trial proceedings, the mother remains unable to provide housing for herself, let alone either of her 2 children.

11.) Mother's misrepresentation to the Court, that she is supplying her own housing, also represents a threat to the children's well-being, as it demonstrates that she is willing to withhold true and accurate information from the Court charged with seeing to the children's best interests and in ensuring their safety and well-being, in order to further her own perceived self-interests.

12.) The child's mother has been unable to maintain steady and stable employment or otherwise secure funds that would enable her to fulfill her parental responsibilities to the child. She has periodically worked with her current boyfriend's company, which mirrors the dependent relationships she has previously maintained with the child's father and other boyfriends, and which has left her without means and without housing, including the home she lost in May of 2015. Mother was unemployed at the time she completed a psychological evaluation in February of 2016, and other than the temporary and undocumented employment with her current boyfriend, mother's most recent

employment was as an exotic dancer. Her sporadic and unstable employment history has been and remains inadequate to provide for the basic necessities of her children.

13.) Mother testified during the trial proceedings that she has "poor relationship habits" with men, with which assessment the Court agrees. Mother has contributed to poor relationships during the child's lifetime, as demonstrated by the multiple criminal case chronologies involving herself and the child's father which were submitted by DCS as exhibits in these proceedings. The mother and father have repeatedly engaged in incidents of domestic violence or violations of protective orders against each other, leading to multiple arrests for domestic violence or invasion of privacy, and causing each other to be temporarily incarcerated as a result, throwing the family household into chaos and chronic instability. The incident which caused the CHINS proceedings for these children in November of 2013, and which was acknowledged by both parents as the basis for the CHINS adjudication on 11/20/13, is one such example. The Court finds that neither parent has taken the necessary steps to address this repeating pattern and resolve the inherent[ly] unstable lives imposed by this conduct upon their children. Rather, the mother and father simply have failed to attend subsequent hearings in the various criminal matters when they have held the status of "victim," leading to routine dismissals of the criminal actions by the State of Indiana because the main witness in the case refuses to participate in the prosecution. The end result of this pattern has been that no remedy for this seminal basis for DCS and Court intervention has been achieved, and the children have lived a life of instability and inherent danger, unless residing with someone other than the parents themselves.

14.) The child's mother has multiple diagnoses for mental health disorders and conditions, including depression, [post-traumatic] stress disorder, and suicidal thoughts and ideations, as set forth in the psychological evaluation completed by Dr. Sara Szerlong

which was submitted as an exhibit in these proceedings. Mother has continued to manifest unhealthy and unstable conduct and ideations late in the CHINS and termination proceedings that have already been in progress and subject to court-ordered services since November of 2013, a period of [twenty-nine] months as of the dates of the termination trial.

Dr. Szerlong's testimony and the related exhibit demonstrate that the child's mother does not have a positive coping strategy in place to deal with her mental health issues as of yet. Additionally, the mother will require further, extended, and lengthy treatment and therapy, including long term use of medications, to achieve stability to the point where a determination of whether she can even then effectively fulfill her parental obligations can be made. The mother is not at this point, again, twenty-nine (29) months into this case. As of the date of trial, these conditions which are a significant part of the child's CHINS conditions and reasons for the continued removal of the child, have not been remedied based on this testimony and the supporting exhibit.

15.) Mother has attempted to argue that her mental health conditions were delayed in being diagnosed, and has attempted to lay blame for the same upon the DCS efforts in the case. However, the child's mother freely admitted during trial, and in agreement with the evidence presented by DCS in its case, that she used and abused illegal drugs throughout the entire first year of the CHINS case itself. Further, the child's mother unilaterally abandoned participation in service provision efforts during the CHINS proceedings and left the state for a significant period of time. Additionally, the child's mother has failed to comply with the basic dispositional and parental participation orders to keep in contact with DCS and notify that agency of her addresses and general whereabouts at multiple times during the pendency of the CHINS and termination proceedings, including the last six months leading up to the termination trial sessions.

16.) The record of non-compliance, criminal and substance abuse conduct, and lack of contact compiled by the mother during the CHINS and termination proceedings makes clear that any delays in diagnosis of her mental health conditions, as well as making progress in any other reunification service, lies at her own feet. Though the Department is required to provide services under most circumstances to attempt to remedy a child's CHINS condition and reunify children with their parents, it legally and appropriately remains the parent's obligation to take whatever necessary steps to successfully resolve the conditions leading to continued removal. Mother's extensive delays and failures to participate, while using drugs, leaving the jurisdiction, and refusing to communicate with the Department, do not meet that definition and are not chargeable to the Department, or a good reason to delay permanency for the children at the center of these matters.

17.) The child's mother has failed to advance in her parenting skills to sufficiently remedy the child's CHINS condition and reunify with the child. She has not demonstrated the use of parenting skills taught in her home-based or individual therapies or during visitation sessions. She has missed multiple visitation sessions without excuse, including multiple sessions where she failed to appear without a call or attempt at explanation or re-scheduling, including a session as late as March of 2016, during which the mother chose to attend another person's birthday party instead of going to visit with her children. Notable also for its unfortunate but predictable impact on the child in these proceedings, the mother failed to acknowledge the child's birthday, which also happens to fall on Christmas Day, in 2015, the child's most recent birthday. Additionally notable is the mother's failure to mention this oversight of basic parenting to witnesses who she called to testify on her behalf, including the same witness who is currently providing for mother's housing, who referred to her as a "good mother," but who was oblivious to mother's failure in this regard prior to cross examination.

****

19.) DCS has identified the alternative permanency plan for the children as adoption by their current foster family. The Court finds this plan as acceptable, appropriate, and conducive to positive futures for both children.

20.) During the pendency of the CHINS and termination proceedings, the elder child has been in individual therapy with his own therapist to attempt to work through the issues thrust upon him by the conduct of his parents and their inability or lack of follow-through in services to reunify with him. The child now manifests conduct making clear that he does not wish to return to the unstable life his parents did and will continue to subject him to. This includes hostility and physical resistance towards and against the mother during visitations, anxiety prior to visitation sessions, and acting out following visitation sessions, including at school. When the child is not demonstrating anger or hostility, he manifests indifference to the mother. There is a lack of a bond between the child and the mother. There is no bond between the children and their father.

21.) The younger child of the sibling set does not demonstrate the same animosity towards the mother as the elder child does, due to the differences in age and context for the younger child. She was less than 18 months old when both children were removed from the parents' care, and has now spent the last 29 months in someone else's home, the vast majority of that with the current pre-adoptive foster parents. The child simply and fortunately does not have the same memory of the instability and chaos as the elder child, and clearly associates her normal and positive existence as a family member of the foster family. Both children have strong and loving familial bonds with the foster parents.

22.) The child's CASA and the DCS family case manager both testified that it would be in the children's best interests to have the parent-child relationship of both children with both parents terminated and for them both to be adopted. The Court now adopts those opinions as its own as a finding of fact for purposes of these proceedings.

23.) It is also in the best interests of both children not to be separated from each other. Neither child has been returned to the care of either parent since the original removal in November of 2013. As the elder child increasingly makes clear by his conduct and during his maturation, he wants no part of a return to either biological parents' home. His greater experience with the parents' failures in raising both children is compelling evidence of what is in the children's best interests, specifically, being made available for adoption.

24.) The above recitation of evidence also demonstrates that there is a reasonable probability that the conditions that led to the detention or continued removal of the children will not be remedied, or that continuation of the parent-child relationship is a threat to the well-being of both children. Each paragraph, individually and in aggregate, makes that showing and is now so found.

25.) In summary, the children have been provided a lengthy period of unsafe and unstable existence at the hands of the two parents. Efforts were made and services offered during approximately 29 months since removal which have failed to resolve these issues on the part of the parents. During this expanse of time of nearly two and a half years, the children have respectively grown from a four year old to a seven year old, and from a 1½ year old to an almost four year old. They have now been provided serious and substantive parenting by a foster family that has devoted its own time, lives, and resources to them, representing a welcome and needed change to what had

taken place before. The children have overcome obstacles and issues while in this new kind of care and stability and now clearly associate themselves as members of the foster family. Disrupting their newly found stability, love, and nurturing in favor of further and extensive time waiting on either parent to gain stability, first for themselves, and then however much later, for the children, would be its own form of child abuse, and an unnecessary gamble and experiment on the backs of these two children. The elements of the termination petition have been met and the parent-child relationship should now be terminated.

Appellant's App. Vol. II, pp. 50-67.

Children have been in the same pre-adoptive home since April 2, 2014. Based upon the testimony of the CASA for I.K. and L.K., the Children are thriving in their current home. "They identify their foster home as their home." Tr. p. 64. "[T]hey are very affectionate with their foster parents . . . [and] foster sisters." *Id*. "[T]hey are very comfortable in their home environment." *Id*.

# Discussion and Decision

This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Thus, we will not reweigh the evidence or judge the credibility of the witnesses. *Id*. We will only set aside the court judgment

terminating a parent-child relationship if it is clearly erroneous. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008).

[7] The traditional right of a parent to establish a home and raise her children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 145 (Ind. 2005). Furthermore, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, parental rights are not absolute and the law allows for the termination of such rights when a parent is unable or unwilling to meet her responsibilities as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans denied*. The purpose of terminating parental rights is to protect the child, not to punish the parent. *Id.* The juvenile court may terminate the parental rights if the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child has suffered from irreversible harm. *Id.*

[8] Before an involuntary termination of parental rights may occur, DCS is required to prove by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>>
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in a termination case is one of "clear and convincing evidence." *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009).

[9]    Here, Mother only challenges three of the juvenile court's findings of fact. Where the juvenile court's unchallenged findings clearly and convincingly support its ultimate decision to terminate parental rights, we find no error. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*. As for the challenged findings, Mother is essentially asking us to

reweigh the evidence as it pertains to Findings 3, 16, and 17, which we will not do. *In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016).

[10] Finding 3 discusses the domestic violence incident that occurred with the Parents and the "lengthy and uninterrupted instability" that the Children had dealt with. Appellant's App. Vol. II, p. 51. Mother argues that this finding contradicts Finding 8 which states that Mother has been an infrequent caregiver for the Children both before and during the CHINS proceedings. The record supports each of these findings. The Children were removed initially due to instability and violence and they have not been returned to Mother's care due to continued instability on Mother's part.

[11] Finding 16 addresses Mother's non-compliance throughout the course of the CHINS and termination proceedings. Mother does not specifically challenge the substance of Finding 16, she merely argues that the juvenile court should have given more weight to the fact that some of her drug screens were negative. The juvenile court is free to judge and weigh the evidence as it sees fit. *Bergman v. Knox Cnty. OFC*, 750 N.E.2d 809, 811-12 (Ind. Ct. App. 2001). The record supports the juvenile court's Finding 16; therefore, we find no error.

[12] Finding 17 discusses Mother's failure to advance her parenting skills sufficiently to reunite with the Children. Mother argues that DCS failed to present any testimony that the Children were harmed during her unsupervised visits with them. While Mother did progress to the point where she was allowed to have unsupervised visits with the Children, the record indicates that Mother's

parenting skills were still lacking in many areas. The record shows that Mother's visits eventually regressed back to pop-ins and then therapeutically supervised visits. At the time of the termination hearing, there was also evidence from the Children's therapist that the visits were becoming detrimental to the Children. There was also testimony from the therapist that she was recommending termination due to a lack of bond between the Children and Mother. Consequently, we conclude that Finding 17 was supported also by evidence in the record.

[13] Mother also argues that DCS did not prove by clear and convincing evidence that the conditions that resulted in the Children being removed could not be remedied, the continuation of the parent-child relationship posed a threat to the Children's well-being, and termination of Mother's parental rights was in the Children's best interests.

## I. Conditions Resulting in Removal Not Likely to Be Remedied

[14] "We begin by noting that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that [his or her] physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *J.K.C. v. Fountain Cnty. Dep't of Pub. Welfare*, 470 N.E.2d 88, 93 (Ind. Ct. App. 1984). "When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of

the parent-child relationship is appropriate." *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 2002).

[15] Here, the juvenile court made numerous thoughtful findings regarding Mother's instability, lack of consistent housing and employment, lack of contact, substance abuse, and criminal history notwithstanding the multitude of services that were designated to address her issues throughout the underlying CHINS and instant termination proceedings. Specifically, the record reveals that Mother's home-based case management was unsuccessfully closed due to her failure to attend, she was unemployed several times throughout the case and had been unemployed since December 2015, she lived in at least ten different residences during the underlying CHINS case, and failed to inform the DCS manager where she was residing. Despite the extensive services provided to Mother, the juvenile court determined, at the time of the termination hearing, that Mother was incapable of providing the Children with a safe and stable home environment. Based upon the ample evidence regarding Mother's non-compliance with the court-ordered services and her inability to maintain stable employment and housing, we conclude that Mother has not sustained her burden to show that the juvenile court's determination in this regard was clearly erroneous.

## II. Continuation of the Parent Child Relationship Posed a Threat to the Children's Well-being

[16] Next we address Mother's claim that DCS failed to show by clear and convincing evidence that the continuation of the parent-child relationship would be detrimental to the Children. Under Indiana Code section 31-35-2-4(b)(2)(B), DCS need only prove that "[t]here is a reasonable probability that the conditions that resulted in the child[ren's] removal or the reasons for the placement outside the home of the parents will not be remedied," that "[t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child," or that the children have been adjudicated as CHINS on two separate occasions. As discussed above, DCS presented ample evidence for the juvenile court to conclude that there was a reasonable probability that the conditions that resulted in the Children's removal would not be remedied. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and in light of our conclusion relating to the probability that the conditions leading to removal would not be remedied, we need not consider Mother's claim as to whether the evidence is sufficient to prove that the parent-child relationship posed a threat to the Children's well-being.

# III.   The Children's Best Interests

[17] Finally, we address Mother's claim that DCS failed to prove that termination of her parental rights was in the Children's best interests. When reviewing such claims, we are mindful of the fact that the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the

circumstances. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, this court must subordinate the interest of the parent to those of the children involved. *Id*.

[18] In addressing whether continuation of the parent-child relationship is in the children's best interests, we note that both the FCM and the CASA testified that termination was in the Children's best interests. Such testimony is sufficient to support the juvenile court's conclusion in this regard. *See In re A.B.*, 887 N.E.2d 158, 170 (Ind. Ct. App. 2008). However, additional evidence further supports the juvenile court's conclusion. Mother has been unable to maintain stable housing and employment. The record shows that Mother has lived in approximately "ten plus" residences during the underlying CHINS case. Tr. p. 77. "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's interests." *In re Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992).

[19] The testimony from service providers established that the Children do not have a strong bond with Mother and their visits with her are not beneficial for them. The testimony also established that visits with Mother are actually detrimental for I.K. because "he is becoming increasingly frustrated about the future . . . and has made comments such as 'my mom doesn't have a home' . . . and does not seem to look forward to the visits." Tr. p. 26. Moreover, according to the

record, I.K. reported to his school that "his increasing behavior" issues are "because he's angry with his mom." Tr. p. 26.

[20] In sum, Mother's history of instability, as well as her lack of consistent participation in the provided services, together support the juvenile court's decision to terminate her parental rights. We decline her invitation to reweigh and reassess the evidence related to the challenged findings. Moreover, the unchallenged findings, alone, are sufficient to support the juvenile court's decision. We therefore conclude that the juvenile court did not clearly err in terminating Mother's parental relationship with I.K. and L.K.

[21] We affirm the judgment of the juvenile court.

Vaidik, C.J., and Brown, J., concur.