

**FILED**

Jan 28 2020, 6:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Valerie K. Boots
Marion County Public Defender –
Appellate Division
Indianapolis, Indidana

Lisa M. Johnson (for Mother)
Brownsburg, Indiana

Steven J. Halbert (for Father)
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the
Parent-Child Relationship of
C.D. (Minor Child),

J.H. (Mother) and
W.D. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner,*

and

January 28, 2020

Court of Appeals Case No.
19A-JT-1549

Appeal from the Marion Superior
Court

The Honorable Marilyn A.
Moores, Judge

The Honorable Scott B. Stowers,
Magistrate

Trial Court Cause No.
49D09-1810-JT-1185

Child Advocates, Inc.,

*Appellee-Guardian ad Litem.*[1]

**Mathias, Judge.**

J.H. ("Mother) and W.D. ("Father") (collectively "the Parents") appeal the order of the Marion Superior Court terminating their parental rights to their minor child C.D. ("Daughter"). Mother presents two issues for our review, which we restate as: (1) whether the trial court's decision to terminate Mother's parental rights is clearly erroneous, and (2) whether the termination of Mother's parental rights should be reversed because it deprives the Parents of their right to determine adoptive placement for Daughter. Father appeals and presents two issues, which we consolidate and restate as whether the termination of Father's parental rights should be reversed because the trial court ignored the Parent's right to determine an appropriate adoptive placement for Daughter.

We affirm.

## Facts and Procedural History

Mother and Father are the biological parents of Daughter, who was born on September 19, 2017. Mother used marijuana during her pregnancy, and Daughter tested positive for marijuana when she was born. The Indiana

---

[1] DeDe K. O'Connor filed an appearance on behalf of Child Advocates, Inc., but did not file a brief.

Department of Child Services ("DCS") filed a petition alleging that Daughter was a child in need of services ("CHINS") on September 22, 2017. This petition alleged that Daughter was in need of services because: (1) Mother failed to provide the child with a safe, stable, and appropriate living environment free from substance abuse; (2) Mother had another child with an active CHINS case;[2] (3) Mother used marijuana during her pregnancy with Daughter, tested positive for marijuana at the time of Daughter's birth, and struggled with depression; and (4) Father demonstrated no ability or willingness to parent the child and was unable to ensure the safety of the child while in Mother's care. At a detention hearing held on September 23, 2017, the trial court authorized Daughter to be removed from the Parents. Daughter was placed in the care of her paternal grandmother ("Grandmother") after the child was released from the hospital. Also on September 23, the trial court appointed a guardian ad litem ("GAL") for Daughter.

[4] A CHINS fact-finding hearing was held on January 17, 2018. At the hearing, Mother admitted to the allegations in the CHINS petition. The trial court found that Father did not have housing, was not employed, and had issues with marijuana use. It also found that Father was not willing to participate in services to address his housing and drug use. The trial court therefore found

---

[2] In the case involving her older child, Mother also failed to complete services and tested positive for marijuana, amphetamine, and methamphetamine. Her parental rights to this child were terminated on August 7, 2018.

Daughter to be a CHINS, ordered DCS to prepare a predispositional report, and set a permanency plan of reunification.

[5] A CHINS dispositional hearing was held on February 7, 2018, and the trial court entered a dispositional order that same day. The dispositional order continued Daughter's placement with Grandmother and required the parents to participate in a variety of services. Specifically, the trial court ordered Mother to participate in home-based therapy, home-based case management, random drug screens, and engagement with a parental aid.[3] The trial court ordered Father to participate in substance abuse treatment, random drug screens, and a Father Engagement Program. The permanency plan remained reunification.

[6] During the course of the CHINS case, Mother failed to appear for any sessions with her home-based counselor. Accordingly, Mother was discharged from home-based counseling in June 2018. Mother also failed to participate in the inpatient substance-abuse treatment referred to her by the Family Case Manager ("FCM"). Mother did marginally better with the home-based case management services; she met with the service coordinator, Marley McClean ("McClean") of Families First, and they set goals of obtaining reliable transportation, participating in drug screens, reunification with Daughter, and finding stable housing and employment. Mother told McClean that she was staying with friends but refused to provide an address where McClean could

---

[3] At this time, Mother was also under a parental participation order in the CHINS case involving her older child.

reach Mother. McClean offered to provide transportation so that Mother could participate in the ordered drug screens, but Mother never took McClean up on her offer. Mother was also inconsistent in meeting with McClean, often missing or cancelling scheduled sessions. In fact, despite being scheduled to meet once per week, Mother met with McClean only four times in a five-month period. Mother was briefly employed during this time but met none of the other goals. Due to Mother's noncompliance, McClean discharged her from services in February 2019.

[7] Mother underwent a substance abuse assessment and reported a history of abusing marijuana, stimulants, and sedatives. Mother declined to participate in intensive outpatient substance abuse treatment and failed to appear for most of the random drug screens between February 2018 and February 2019. The drug screens she did take in November 2018 and January 2019 were positive for marijuana use. The trial court had ordered Mother's visitation with Daughter to be contingent on her submitting to random drug screens. Because Mother had not consistently done so, the trial court never authorized any visitation. Consequently, Mother had not seen the child since the unauthorized visit at Father's home in September 2018.

[8] Father followed a similar course of non-compliance with the offered services. Father participated sporadically with his home-based case management service providers and lacked stable housing. Father met with the first home-based case management provider only twice and with the second provider only once. A third provider attempted to contact Father but was unsuccessful.

[9] Father was also referred to substance abuse counseling, but he failed to appear for any of the scheduled sessions and was discharged from the program. He then enrolled in outpatient treatment but failed to attend because, by that time, he planned on consenting to Daughter's adoption by Grandmother. He too failed to appear for multiple drug screens between November 2017 and March 2019, and the two drug screens he took in January 2019 tested positive for marijuana use.

[10] Father was referred to visitation services in July 2018, but was discharged the following month because of non-cooperation. He was again referred to visitation services in October 2018, and the visitation coordinator was able to schedule visitation. Father participated in visitation only sporadically even though the visits were scheduled to accommodate his work and transportation schedules. He canceled two of the scheduled visits in October 2018, and, in November and December of that year, showed up to only four of the sixteen scheduled visits. He then canceled three of the visits scheduled for January 2019. The trial court then reduced Father's visitation to one session per month. But Father did not visit Daughter in March or April 2019 and declined to schedule make-up visits.

[11] The trial court authorized Grandmother to supervise visitations between Father and Daughter, but the trial court rescinded this authority in its order following a June 6, 2018 review hearing. Instead, the court ordered "parenting time for [F]ather at an agency or by a service provider." Ex. Vol., Petitioner's Ex. 17. On September 2, 2018, however, Grandmother permitted Daughter to visit

Father, unsupervised, at a mobile home in Greenwood, Indiana, where Father was living. For reasons not revealed in the record, Officer Joseph Taylor ("Officer Taylor") of the Greenwood Police Department was dispatched to the home. When Officer Taylor went to the house, it was in disarray. He found Mother asleep in bed. Lying next to her, face down, was one-year-old Daughter. There was a portable playpen in the home available for the child to sleep in, but it was full of other items. Daughter was uninjured, but her feet were dirty. and she appeared not to have been bathed for some time. Mother was disoriented and provided a false name to Officer Taylor. Next to the bed were two glass pipes with burnt marijuana residue. Mother admitted the pipes were hers and that she had smoked marijuana earlier in the day. Father arrived some time later and told Officer Taylor that he had left to get groceries. Officer Taylor arrested Mother for possession of paraphernalia and neglect of a dependent. Officer Taylor contacted DCS, who placed Daughter in non-relative foster care (the "Foster Parents").

[12] On September 6, 2018, DCS filed a motion requesting that Daughter be removed from Grandmother's care and placed in the care of the Foster Parents. The trial court granted this motion the same day. At a September 19, 2018 permanency hearing, the trial court denied a request to place Daughter with Grandmother. The trial court also changed the permanency plan from reunification to adoption. DCS filed petitions seeking to terminate Mother and Father's parental rights on October 10, 2018.

On February 7, 2019, DCS filed a motion requesting that Daughter be placed back in Grandmother's care. This motion stated in part:

> The DCS is requesting authorization for placement in Relative Care because DCS supports placement with [Grandmother] so that [she] can adopt.
>
> [Grandmother] is willing to allow unannounced visits to her home.
>
> Both the DCS and [the GAL] are in support of placement with [Grandmother] for purposes of adoption.
>
> In addition, [the Parents] support the proposed change in placement, and will sign adoption consents for [Grandmother] to adopt.

Supp. App. p. 2.

On March 11, 2019, the Foster Parents filed an objection to DCS's request to place Daughter back with Grandmother. In their objection, the Foster Parents claimed that Grandmother had not provided Daughter with the appropriate medical care and fed her an inappropriate diet, that Daughter was behind in her physical development and could not sit up on her own, that her head was flattened in the back, and that she had suffered from untreated constipation. The trial court heard argument on the motion to place Daughter with Grandmother on March 13, 2019, and denied it that same day.

Also on March 13, 2019, the trial court held the first part of a two-day evidentiary hearing on the petition to terminate parental rights. At the hearing, DCS presented evidence showing that neither Mother nor Father successfully

participated in the offered services or otherwise addressed their substance-abuse problems.

[16] On April 14, 2019, after the first day of the evidentiary hearing on the termination petitions but before the second day of the hearing, DCS received a "310 report," alleging that, while in the care of the Foster Parents, Daughter was dirty, vomiting, and had a fever and runny nose. Tr. Vol. 2, p. 206. At approximately the same time, Father complained to the FCM that he was concerned with Daughter's appearance at his supervised visits. The FCM spoke with the visitation facilitator and the Foster Parents, who did not corroborate Father's complaints.[4]

[17] Then, on April 16, 2019, the GAL filed a motion to reconsider the order denying DCS's request to place Daughter with Grandmother. In its motion to reconsider, the GAL indicated that, since the March 13 order, it had received documentation from Daughter's pediatrician showing that Daughter "was fully caught up on her vaccines, along with review of medical milestones, diet and other well check markers. No concerns were ever noted by this doctor about the development or [Grandmother]'s treatment of [Daughter]." Supp. App. p. 4. The motion also stated that the GAL had received photographic evidence showing that Daughter could sit up by herself and could pull herself up "at least partially," and "was not suffering from a flattened rear head as alleged, and that

---

[4] The FCM ultimately permitted a DCS assessor to investigate the report, but, as of the second evidentiary hearing date, the assessor had yet to come to a conclusion.

[Grandmother] was both aware of the child's constipation and provided the [Family Case Manager] with information about this to ensure the child continued to receive appropriate feedings to help with the issue." *Id*. at 5. The GAL attached to its motion the documentation supporting its position, including medical records and photographs. At the time of the termination hearing, the trial court had yet to rule on the motion to reconsider. We note, however, that pursuant to Indiana Trial Rule 53.4(B), a motion to reconsider is deemed denied if it is not ruled upon within five days. *See Snyder v. Snyder*, 62 N.E.3d 455, 459 (Ind. Ct. App. 2016). Thus, the GAL's motion to reconsider was deemed denied on April 21, 2019.[5]

[18] The trial court held the second day of the evidentiary hearing on the termination petitions on April 23, 2019, and took the matter under advisement. On May 23, 2019, the trial court entered orders terminating Mother and Father's parental rights to Daughter. Mother and Father now appeal.

## Termination of Parental Rights

[19] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:

---

[5] This does not mean that the trial court was without authority to rule on a motion to reconsider after five days have passed, as a trial court has the inherent power to reconsider any previous ruling so long as the action remains in fieri. *Id*.at 458 (citing *Citizens Indus. Group v. Heartland Gas Pipeline, LLC*, 856 N.E.2d 734, 737 (Ind. Ct. App. 2006), *trans. denied*; *Stephens v. Irwin*, 734 N.E.2d 1133, 1135 (Ind. Ct. App. 2000), *trans. denied*).

(i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[20] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). But because Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection 4(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*.

[21] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[22] The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d at 1259.

## Standard of Review

[23] Indiana appellate courts have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[24] We also note that Mother does not challenge any of the trial court's factual findings as being clearly erroneous. We therefore accept the trial court's findings as true and determine only whether these unchallenged findings are sufficient to support the judgment. *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct.

App. 2019), *trans. denied*); *see also* *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) (holding that when the trial court's unchallenged findings support termination, there is no error), *trans. denied*.

### I. Mother's Arguments

*A. Conditions That Resulted in Daughter's Removal*

[25] Mother first claims that the trial court clearly erred by concluding that there was a reasonable probability that the conditions that resulted in Daughter's removal from her care, or the reasons for Daughter's continued placement outside Mother's home, would not be remedied. When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156–57 (Ind. Ct. App. 2013), *trans. denied*. The trial court may disregard efforts made only shortly before termination and give more weight to a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[26] The condition that led to Daughter's removal was Mother's drug use while pregnant with the child. After Daughter's birth, Mother did nothing to address her substance abuse problems. She missed multiple drug screens and tested positive for marijuana use when she did submit to drug screens. She declined to participate in the substance abuse treatment services provided to her. Indeed,

Mother admits that neither she nor Father have "not completed services or remained sober." Appellant's Br. at 15. The trial court therefore did not clearly err by concluding that there was a reasonable probability that the condition that resulted in Daughter's removal from Mother's care, or the reason for her continued placement outside Mother's home, would not be remedied.

Mother argues that the conditions that led to Daughter's removal were remedied by placing Daughter with Grandmother. We agree with DCS, however, that a child's placement is not the focus of this statutory element. The focus is on whether a *parent* has remedied the conditions such that the child can safely be returned to her care. Here, this is clearly not the case.[6]

### B. Best Interests of the Child

Mother next argues that the trial court clearly erred in concluding that termination of her parental rights was in Daughter's best interests. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the trial court must subordinate the interests of the parent to those of the child and need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.*

---

[6] Mother also argues that the trial court erred by concluding that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Daughter's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(ii). As noted *supra*, however, the trial court was required to find only that one prong of subsection 4(b)(2)(B) had been established. *In re A.K.*, 924 N.E.2d at 220. Because we have concluded that DCS proved that there was a reasonable probability that the conditions which resulted in Daughter's removal from Mother's care would not be remedied, we need not address her arguments directed at the "threat" prong of Section 4(b)(2)(B). *See In re A.K.*, 924 N.E.2d at 220.

Moreover, a recommendation by the case manager or a child advocate, such as a guardian ad litem, to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158–59.

[29] The trial court found that termination was in Daughter's best interests because it would allow her to be adopted into a stable and permanent home. Mother's argument regarding this element focuses on her desire that Grandmother be permitted to adopt Daughter. Mother argues that, if her parental rights are terminated, there is an increased chance that the Foster Parents will be permitted to adopt Daughter instead of Grandmother. Mother also notes that, when Daughter was placed with Grandmother, she bonded with Grandmother and her two-year-old cousin and thirteen-year-old uncle who also lived with Grandmother, in addition to numerous other relatives. Mother argues that cutting Daughter completely off from her existing family cannot be in Daughter's best interest.

[30] Mother also refers to evidence that indicates that the Foster Parents are not as capable of taking care of Daughter as is Grandmother. Specifically, she notes that the Foster Parents both work full-time, requiring Daughter to be in day care while they work, as opposed to Grandmother who was able to devote more time to the care of the child. She also refers to the report that Daughter was dirty and sick while in the care of the Foster Parents. Additionally, Mother claims that the Foster Parents presented false evidence to the trial court when they objected to DCS's motion requesting that Daughter be returned to

Grandmother's care. Referring to the material submitted by the GAL that contradicted the Foster Parents' claims, Mother now contends that the Foster Parents intentionally presented misleading and false evidence to the court in their objection. All of these arguments, however, are little more than a request that we reweigh the evidence presented to the trial court, which we may not do. *In re D.B.*, 942 N.E.2d at 871.

[31] Mother also makes much of the fact that both DCS and the GAL recommended that Daughter be placed with Grandmother. Be that as it may, the GAL testified that termination of Mother's parental rights was in Daughter's best interests because Mother had not completed any of the offered services and failed to address her substance abuse problem. The FCM also recommended termination of Mother's parental rights due to her lack of stability, failure to participate in services, continued substance abuse, and unwillingness to act as a parent to Daughter. Based on this testimony, the trial court reasonably concluded that termination of Mother's parental rights was in Daughter's best interests.

*C. Satisfactory Plan for the Care and Treatment of the Child*

[32] Mother further contends that the trial court clearly erred by concluding that there was a satisfactory plan for the care and treatment of Daughter. We have explained before that the plan for the care and treatment of a child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. "A DCS plan is

satisfactory if the plan is to attempt to find suitable parents to adopt the children." *Id.* That is, "there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent." *Id.* Here, the trial court found that the plan for the care and treatment of Daughter is adoption, which is a satisfactory plan. *See id.*

[33] Mother does not deny that adoption is a satisfactory plan, and she acknowledges that adoption by a non-relative foster family is usually deemed to be satisfactory. Appellant's Br. at 21 (citing *In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*). Mother argues, however, that there was evidence that the Foster Parents were not properly caring for Daughter and that they submitted false evidence to the court. Again, this is simply a request that we reweigh the evidence. More importantly, however, the trial court did not conclude that adoption by the Foster Parents was appropriate. It simply concluded that the plan for adoption was a satisfactory plan. Mother admits that adoption is a satisfactory plan, and this is all that is required at this stage.

## II. *Fundamental Right to Determine Adoptive Parent*

[34] Lastly, both Parents argue that they have a fundamental right to choose who will adopt Daughter and that, by terminating their parental rights, the trial court effectively refused to place Daughter with Grandmother, contrary to the desires of the Parents, DCS, and the GAL.

[35] We agree that parents have a fundamental right to raise their children. As explained by our supreme court in *In re G.Y.*:

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize, however, that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, [p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

904 N.E.2d at 1259–60 (citations and internal quotation marks omitted).

[36] Under normal circumstances, a child's parents have the right to determine whether their child will be adopted and by whom she will be adopted. *See* Ind. Code § 31-19-9-1(a)(2) (providing that a petition to adopt a child may be granted only if written consent to adoption has been executed by the mother of a child born out of wedlock and the father who has established paternity). But parental rights are not absolute. And, here, Mother and Father's parental rights have been terminated. Their argument regarding their right to consent to adoption puts the "cart before the horse." That is, termination cannot be improper because it deprived the Parents of their right to consent to Daughter's adoption. Termination is proper because they failed to address their substance abuse problems and because termination is in Daughter's best interests. The result of this is that *all* of Mother and Father's parental rights, including the

right to consent to adoption, have been terminated. This fact is not grounds for reversing the termination, it is a consequence of the termination.[7]

[37] The Parents also argue that the trial court erred by failing to permit Grandmother to adopt Daughter, contrary to the wishes of the Parents, DCS, and the GAL. But the question before the trial court in the termination action was not *who* should be allowed to adopt Daughter. The question before the termination court was whether the Parent's parental rights should be terminated. Who will ultimately be permitted to adopt Daughter is a question for the adoption court, not the termination court. *In re A.S.*, 17 N.E.3d at 1007 ("[I]t is within the authority of the adoption court, not the termination court, to determine whether a particular adoptive placement is appropriate."); *see also In re D.J.*, 755 N.E.2d 679, 685 (Ind. Ct. App. 2001) (noting, in response to mother's concerns regarding foster family adopting children following the termination of her parental rights, that "if the foster family desires to adopt the children, the home will have to be approved as an appropriate and suitable environment for the children."), *trans. denied*. The same is true here, and the

---

[7] Mother also briefly argues that the trial court erred by denying the Parents' motion to dismiss the termination case. But only DCS, a child's Court Appointed Special Advocate ("CASA"), or the child's GAL may file a petition to terminate parental rights, Ind. Code § 31-35-2-4(a), or move to dismiss such a petition. Ind. Code § 31-35-2-4.5. Mother notes that, under subsection 4.5(d)(1), care by a relative may be a "compelling reason" for concluding that termination is not in the best interests of the child. But section 4.5(d) also provides that DCS, the CASA, or the GAL, "*may* file a motion to dismiss [a] petition to terminate the parent-child relationship," if certain circumstances are present. The statute does not require that such a petition be filed simply because a child has been placed in relative care. And, as explained above, the trial court did not clearly err in determining that termination of Mother's parental rights was in Daughter's best interests.

question of who is the more suitable adoptive party for Daughter will be determined by the adoption court.

## Conclusion

[38] The trial court did not clearly err in determining that there was sufficient evidence to support the termination of the Parents' parental rights. And the rights that the Parents possessed, including the right to consent to the adoption of Daughter, were rightly terminated. Thus, the Parents no longer have a fundamental right to consent to the adoption of Daughter, and the question of the proper adoptive home for Daughter is a question for the adoption court.

[39] Affirmed.

Kirsch, J., and Bailey, J., concur.