## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 10 2020, 7:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennie Scott
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

John R. Millikan
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.S. and L.S. (Minor Children)

and

L.Y. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

March 10, 2020

Court of Appeals Case No. 19A-JT-2004

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

The Honorable Amanda Yonally, Magistrate

Trial Court Cause Nos. 18C02-1811-JT-130, -131

**Crone, Judge.**

# Case Summary

L.Y. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor children J.S. and L.S. ("Children"), arguing that the evidence is insufficient to support it.[1] Finding the evidence sufficient, we affirm.

# Facts and Procedural History

The unchallenged findings of fact show that J.S. was born on June 10, 2014, to Mother and father ("Father"). On August 14, 2014, the Indiana Department of Child Services ("DCS") removed J.S. from his parents' care based on allegations that he was not gaining weight properly and the conditions of the home were poor. J.S. was admitted to a hospital and diagnosed with stage 2 malnutrition. At home, Mother and Father had pets that regularly urinated and defecated on the floor. On September 19, 2014, J.S. was adjudicated a child in need of services ("CHINS") and was placed in foster care with H.W. DCS family case manager ("FCM") Hillary Mundon was assigned to J.S.'s case. DCS provided carpet cleaning and cleaning supplies and helped Mother and Father clean the home. Mother and Father were cooperative with services, and the case was dismissed on January 12, 2016.

---

[1] The parent-child relationship between the Children and their biological father was terminated in the same order, but he is not participating in this appeal.

[3]     On November 24, 2015, while J.S.'s CHINS case was still pending and he was at home for a trial home visit, Mother gave birth to J.S.'s brother L.S. On February 11, 2016, DCS removed L.S. from his parents' care based on allegations that he had failed to thrive and had not received appropriate medical care. L.S. was admitted to a hospital and diagnosed as "failure to thrive." Appealed Order at 2 (finding #11). L.S. had gained only two ounces between December 16, 2015, and February 9, 2016, but he gained eight ounces within his first two days at the hospital. L.S. was placed in foster care with H.W. FCM Mundon was assigned to L.S.'s case.

[4]     J.S. remained at home with his parents until May 9, 2016, when DCS removed him based on allegations of medical neglect. J.S. had been injured by pulling a television on his leg on May 6, 2016. *Id*. at 2 (#15); Tr. Vol. 2 at 82-83. Three days later, H.W., who was providing childcare for J.S., observed that J.S. could not walk and was crying inconsolably. H.W. and FCM Mundon took J.S. to the hospital, where X-rays revealed that J.S.'s leg was broken. Neither J.S. nor L.S. has been returned to Mother's care since their removal from the home. In June and August 2016, the trial court conducted CHINS factfinding hearings and determined that J.S. and L.S. were CHINS. Dispositional hearings were held, and dispositional orders were issued in September 2016 in L.S.'s case and October 2016 in J.S.'s case.

[5]     FCM Mundon was assigned to J.S.'s and L.S.'s cases until June 2016. FCM Mundon observed a lot of name-calling and yelling in the home and noted that Mother was often frustrated and angry. Appealed Order at 5 (#49). H.W. also

overheard Mother call J.S. and L.S. names, including "little bastards." *Id.* (#50). Dr. Milissa Eley served as J.S. and L.S.'s doctor from the time they were born until July 2018. She had concerns regarding Mother's interactions with J.S. because Mother often yelled at J.S. and openly called him names at most visits, including "'bastard,' 'fucker,' and 'asshole.'" *Id.* at 3 (#30). FCM Mundon put services in place for Mother including parenting classes, home-based therapy, and supervised visitation.

[6] Between June 2016 and February 2018, Dominique Geers was assigned as the Children's FCM. "When FCM Geers received the case, poor parenting skills was the primary issue preventing reunification with the [C]hildren." *Id.* at 5 (#54). "FCM Geers observed dysfunction with the parents' communication with J.S. and L.S., frustration and anger between the parents, and inconsistency with the parents providing basic needs such as food, diapers and formula for L.S. and J.S. at visits." *Id.* (#55). "FCM Geers observed Mother and Father yelling and cursing at the [C]hildren and at each other, and [p]arents did not utilize appropriate discipline with J.S. and L.S." *Id.* (#56-57). From October 2016 through February 2017, Spencer Osborn supervised Mother's visitation with the Children. *Id.* at 6 (#62). During supervised visitation, Osborn observed Mother and Father frequently yelling and cursing at each other and at the Children. *Id.* (#63).

[7] In May 2017, Mother and Father ended their relationship. Mother moved out of the home and began living with her boyfriend. Between May 2017 and February 2018, Mother did not provide FCM Geers with her address.

[8] After a hearing held in June 2017, the trial court found that Mother had complied with the Children's case plans and had participated in home-based casework, individual therapy, drug screens, and completed a substance abuse assessment. Ex. Vol. 1 at 51; Ex. Vol. 3 at 59. However, the court also found that Mother had not enhanced her ability to fulfill her parental obligations because she continued to demonstrate poor and detrimental interactions with L.S. during visitation and regularly produced drug screens that were positive for illicit substances. Ex. Vol. 3 at 59-60. Between December 2016 and May 2017, Mother used cocaine. Appealed Order at 6 (#66).

[9] After an October 2017 hearing, the trial court found that Mother had complied with the case plan and was actively engaged in all services; had been doing drug screens and been negative for all illegal substances; interacted with and was attentive to the Children's needs, and had enhanced her ability to fulfill her parental obligations. Ex. Vol. 1 at 54; Ex. Vol. 3 at 63. However, Mother needed stable housing and a source of income. Ex. Vol. 1 at 54.

[10] Between November 2017 and October 2018, Marci Smith provided supervision for Mother's visitations with the Children. Smith observed that Mother constantly yelled and cursed during visitation and was inconsistent in discipline. Appealed Order at 7 (#89).

[11] In February 2018, Courtney Barber became the Children's FCM. When FCM Barber got involved in the Children's cases, she believed that Mother was doing fairly well with services and that the primary barriers to reunification "included

[Mother's] lack of stable housing and consistent income." *Id*. at 8 (#93). At that time, Mother was living in a home with other people who were not deemed appropriate by DCS. Tr. Vol. 2 at 213. In April 2018, Mother obtained suitable housing for the Children and began exercising supervised visitation at her home. Appealed Order at 8 (#95). Mother continued "excessively yelling" at J.S. and L.S. *Id*. (#97). FCM Barber frequently addressed Mother's excessive yelling and cursing, and Mother was counseled about her parenting in April, June, and July 2018. *Id*. (#98). "Mother yelled and cursed at J.S. and L.S. progressively less frequently between April and June 2018." *Id*. (#99).

[12] In June 2018, Mother's visitation progressed to unsupervised. *Id*. (#96). "By August of 2018, Mother had progressed to overnight and weekend visitation." *Id*. (#102). However, during one of the Children's overnight visits in August, police were dispatched to Mother's home based on a report that Mother was suicidal. *Id*. (#104). Police observed drug paraphernalia in the home. *Id*. (#105). During the police visit, Mother started "screaming and acting erratically." *Id*. (#106). An officer attempted to handcuff her, and she physically resisted. Mother's boyfriend became aggressive and struck an officer. Mother and her boyfriend were arrested and put in jail. *Id*. (#108).

[13] After that incident, Mother's visitation was returned to supervised visitation. Mother "resumed an increased frequency of yelling and cursing at J.S. and L.S. during visits." *Id*. at 9 (#111). In October 2018, Mother's supervised visitation with J.S. and L.S. was ended because of her yelling, cursing, and arguing, and later that month her visitation was suspended. *Id*. at 10 (#132).

[14] Mother also resumed her drug use. While FCM Barber was assigned to the Children's cases, Mother submitted to nineteen drug screens. *Id*. (#131). Thirteen of the drug screens were positive for an illicit substance, including suboxone, hydrocodone, Xanax, and morphine. Mother was unable to provide a valid prescription for suboxone.

[15] Mother's financial and housing situation was also problematic. In September 2018, Mother did not have electricity in her home and was unable to provide food for J.S. and L.S. during visits. *Id*. at 9 (#113). In October 2018, Mother was evicted from her home and moved in with a neighbor. *Id*. (#127). Between October 2018 and January 2019, FCM Barber was unable to make contact with Mother.

[16] On November 21, 2018, DCS filed a verified petition for involuntary termination of the parent-child relationship. J.S. and L.S. were removed from H.W.'s care and placed in a pre-adoptive foster home. *Id*. at 10 (#134). In early 2019, Mother returned to the residence she had lived in before April 2018 and continues to reside there. *Id*. at 10 (#128). That residence had been previously deemed unsuitable for children by DCS because of the people who were living there with Mother.

[17] On May 2 and 9, 2019, the trial court held a factfinding hearing. On July 30, 2019, the trial court issued findings of fact and conclusions thereon and order terminating parent-child relationship containing the foregoing and the following findings:

51. Mother admittedly is not an affectionate person. She is not nurturing toward J.S. and L.S. and lacks adequate parenting skills.

….

57. Parents did not utilize appropriate discipline with J.S. and L.S.

….

61. Mother has demonstrated both progression and regression in therapy.

….

65. Mother and Father would improve in their interactions with the [C]hildren and each other, and then parents would regress.

….

71. Mother's unstable housing delayed Mother's progress toward reunification with L.S. and J.S.

….

112. Mother has participated in home-based case work and home-based therapy but has not made substantial progress in addressing each of her treatment goals.

….

136. J.S. and L.S. need a safe, stable, secure and permanent environment in order to thrive. Mother and Father have not shown the inclination or the ability to provide the [C]hildren with such an environment.

137. Candace Ingle is the Court Appointed Special Advocate [("CASA")] assigned to J.S. and L.S. Ms. Ingle has been L.S.'s CASA since February 2016 and has been J.S.'s CASA since May of 2016. Ms. Ingle has determined that it is in the best interest of J.S. and L.S. to terminate both Mother and Father's parental rights.

138. …. As of the conclusion of the Fact-Finding Hearing in this matter, J.S. had been out of the care of his parents for more than 36 months.

….

140. …. As of the conclusion of the Fact-Finding Hearing in this matter, L.S. had been out of the care of his parents for more than 38 months.

141. There is a reasonable probability that the conditions that resulted in J.S. and L.S.'s removal and continued placement outside the home will not be remedied. The primary reason for the removal of both [C]hildren from the care of their parents was parental neglect, specifically medical neglect of both [C]hildren. Although Mother has participated in some services throughout the duration of the CHINS cases, she has not benefited from the services in a way that would alleviate the conditions that resulted in the [C]hildren remaining out of the home or ensure that she would be capable of providing a home free of neglect. …. Despite assistance and opportunities to improve parenting skills, home conditions and stability in the three years since the [C]hildren were removed, neither parent has demonstrated an

ability to provide J.S. and LS. with a home free of abuse and neglect. At the time of the Fact-Finding Hearing, Mother did not have suitable housing for the [C]hildren. …. Mother and Father's habitual patterns of conduct support the substantial probability of future neglect or deprivation of the [Children].

*Id*. at 5-11 (citation omitted). In addition, the trial court concluded that termination of the parent-child relationship was in the Children's best interests and that DCS had a satisfactory plan for the Children's care and treatment, which included adoption. *Id*. at 11. Based on its conclusions, the trial court terminated Mother's parental rights. This appeal ensued.

## Discussion and Decision

[18] Mother seeks reversal of the termination of her parental rights. In considering her appeal, we recognize that "a parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quoting *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)). "[A]lthough parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). Involuntary termination of parental rights is the most extreme sanction, and therefore "termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*.

A petition to terminate a parent-child relationship involving a CHINS must, among other things, allege:

>    (B) that *one* (1) of the following is true:

>    > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

>    > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

>    > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

>    (C) that termination is in the best interests of the child; and

>    (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (emphasis added). DCS must prove each element by "clear and convincing evidence." *R.S.*, 56 N.E.3d at 629; Ind. Code § 31-37-14-2. DCS need only prove one of the options listed under subsection 31-35-2-4(b)(2)(B). If the trial court finds that the allegations in the petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

"We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Indiana Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> In considering whether the termination of parental rights is appropriate, we do not reweigh the evidence or judge witness credibility. We consider only the evidence and any reasonable inferences therefrom that support the judgment, and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. [Ind. Trial Rule 52(A)]. In evaluating whether the trial court's decision to terminate parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment.

*K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229-30 (Ind. 2013) (citations and quotation marks omitted). We further note that Mother has directly challenged only one of the trial court's findings. When findings of fact are unchallenged, this Court accepts them as true. *S.S.*, 120 N.E.3d 605, 608, n.2 (Ind. Ct. App. 2019). As such, if the unchallenged findings clearly and convincingly support the judgment, we will affirm. *Kitchell v. Franklin*, 26 N.E.3d 1050, 1059 (Ind. Ct. App. 2015), *trans. denied*; *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*.

# Section 1 – Sufficient evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from or the reasons for placement outside Mother's home will not be remedied.

Mother first challenges the sufficiency of the evidence supporting the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside her home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i). In reviewing whether there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside Mother's home will not be remedied, we engage in a two-step analysis. *K.T.K.*, 989 N.E.2d at 1231. First, "we must ascertain what conditions led to placement and retention in foster care." *Id.* Second, we "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. When the trial court makes its determination, it must evaluate a parent's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect

or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). In addition, a trial court may consider services offered by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a reasonable probability that the parent's behavior will not change.'" *A.D.S.*, 987 N.E.2d at 1157 (quoting *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)).

[22] Here, the conditions that resulted in the Children's removal and placement outside Mother's home arose from her parental neglect. L.S. was not gaining weight, and Mother seemingly failed to recognize that a doctor's visit was vital to address his condition. She also failed to recognize that J.S. needed medical attention after a television fell on him. Only through H.W.'s intervention did J.S. receive medical care to determine that his leg was broken. Mother received services to improve parenting skills, the home condition, and stability, but Mother used drugs, failed to maintain stable housing, verbally abused the Children, and did not provide appropriate discipline. At times she improved, but her improvement was short-lived. Although the Children were removed in early 2016, it was not until the summer of 2018 that unsupervised overnight and

weekend visitation was attempted. That attempt was unsuccessful because Mother and her boyfriend were arrested when the Children were spending the night with Mother. Unsupervised visitation was resumed, but that was terminated a month or two later due to Mother's poor interaction with the Children. Then, Mother was evicted from her home. The trial court found that Mother did not have suitable housing for the Children at the time of the termination hearing, but Mother contends that this finding is clearly erroneous. Assuming, without deciding, that Mother is correct, if the remaining unchallenged findings support the trial court's conclusion, we may affirm. *See Kitchell*, 26 N.E.3d at 1059.

[23] The unchallenged findings show that over the course of three years, Mother was on and off illegal substances and in and out of suitable housing, improved her interactions with the Children, and then reverted to verbal abuse. Mother's habitual patterns are sufficient to support a finding that there is a reasonable probability that her behavior will not change and the problematic situation will not improve. Mother's argument is merely a request to reweigh the evidence, which we must decline. We conclude that the evidence is sufficient to support the trial court's conclusion that there is a reasonable probability that the

conditions that resulted in the Children's removal and continued placement outside her home will not be remedied.[2]

## Section 2 – Sufficient evidence supports the trial court's conclusion that termination is in the Children's best interests.

Mother next argues that sufficient evidence does not support the trial court's conclusion that termination is in the Children's best interests. To determine whether termination is in a child's best interests pursuant to Indiana Code Section 31-35-2-4(b)(2)(C), the trial court must look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. Termination of parental rights is not appropriate solely because there is a better home available for the child. *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). However, in assessing a child's best interests, the trial court "must subordinate the interests of the parents to those of the child." *A.D.S.*, 987 N.E.2d at 1158. "[C]hildren cannot wait indefinitely for their parent to work toward preservation or reunification–and courts 'need not wait until a child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship.'" *E.M.*, 4 N.E.3d at 648 (quoting *K.T.K.*, 989 N.E.2d at 1235). "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "[W]e have previously held that recommendation by both the case

---

[2] Due to our resolution of this issue, we need not address Mother's argument that the trial court erred in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being.

manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S.*, 987 N.E.2d at 1158-59.

[25] Here, FCM Barber testified that adoption "was best for the [Children] to provide stability in their life and to achieve permanency for them." Tr. Vol. 2 at 245. The Children's CASA recommended that termination be granted, emphasizing that the "case had been ongoing for four years with a break of just a few months in between …. [S]ervices have been offered, and some have been accepted, some have been refused and, we're still at this point four years later." Tr. Vol. 3 at 33-34. The FCM's and CASA's testimony in support of termination, combined with the evidence discussed above supporting the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from or reasons for placement outside Mother's home will not be remedied, is sufficient to support the trial court's conclusion that termination is in Children's best interests. *See A.D.S.*, 987 N.E.2d at 1158-59; *see also A.I.*, 825 N.E.2d at 811 (concluding that CASA's and case manager's testimony, coupled with evidence that conditions resulting in continued placement outside of home will not be remedied, sufficient to prove by clear and convincing evidence termination is in child's best interests); *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003) (concluding that CASA's and case manager's testimony that

termination would serve children's best interests sufficient to support court's best interests determination).

## Section 3 – Sufficient evidence supports the trial court's conclusion that there is a satisfactory plan for the Children's care and treatment.

[26] Finally, Mother challenges the trial court's conclusion as to Section 31-35-2-4(b)(2)(D), arguing that DCS did not carry its burden to prove that the plan for the Children's care and treatment is satisfactory based solely on FCM Barber's testimony that the plan for the Children is adoption. We note that "Indiana courts have traditionally held that for a plan to be 'satisfactory,' for the purposes of the termination statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*).

> A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children.

*Id.* (citations omitted).

[27] Here, FCM Barber testified that adoption was the plan for the Children. In addition, Mother does not challenge the trial court's finding that J.S. and L.S.

were placed with a pre-adoptive family in November 2018. DCS is taking action to find a suitable adoptive parent for the Children. Accordingly, we conclude that the evidence is sufficient to support the trial court's conclusion that there is a satisfactory plan for the Children's care and treatment. *See In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004) (where current foster family was not ready to make final decision on whether to adopt child, DCS's plan for child to be adopted by that family or another family gave a general sense of direction for child's care and treatment and therefore was satisfactory), *trans. denied*.

[28] Based on the foregoing, we affirm the involuntary termination of Mother's parental rights to the Children.

[29] Affirmed.

May, J., and Pyle, J., concur.